**INTERNATIONAL CABLEVISION, INC. d/b/a Adelphia Cable, Plaintiff–Appellant,**

v.

**John SYKES and Marvin Noel, Defendants–Appellees.**

Nos. 1423, 1905.
Dockets 94–7887, 94–7889.

United States Court of Appeals, Second Circuit.

Argued May 17, 1995.

Decided Jan. 26, 1996.

Geoffry D.C. Best, New York City (Lorna M. McKenzie, LeBoeuf, Lamb, Greene & MacRae L.L.P., Randall D. Fisher, Athena Jamesson, International Cablevision, Inc. d/b/a Adelphia Cable, Coudersport, Pennsylvania, Daniel J. Lefkowitz, William B. Jung, Law Offices of Daniel J. Lefkowitz, Jericho, New York, of counsel), for Plaintiff–Appellant.

Rodney O. Personious, Buffalo, New York (Brown & Kelly, of counsel), for Defendant–Appellee Marvin Noel.

George R. Blair, Jr., Buffalo, New York (Bouvier & O'Connor, of counsel), for Defendant–Appellee John Sykes.

Before: ALTIMARI, MAHONEY, and WALKER, Circuit Judges.

MAHONEY, Circuit Judge:

Plaintiff-appellant International Cablevision, Inc. d/b/a Adelphia Cable ("Cablevision") appeals from judgments entered August 12, 1994 against defendants-appellees John Sykes and Marvin Noel in the United States District Court for the Western District of New York, John T. Curtin, *Judge,* that granted Cablevision's motions for summary judgment pursuant to 47 U.S.C. § 553[1]

---

1. As pertinent to the issues presented on this appeal, § 553 provides:

(a) **Unauthorized interception or receipt or assistance in intercepting or receiving service; "assist in intercepting or receiving" defined**

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

. . . .

(c) **Civil action in district court; injunctions; damages; attorney's fees and costs; regulation by States or franchising authorities**

(1) Any person aggrieved by any violation of subsection (a)(1) of this section may bring a civil action in a United States district court or in any other court of competent jurisdiction.

(2) The court may—

(A) grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section;

(B) award damages as described in paragraph (3); and

(C) direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails.

(3) (A) Damages awarded by any court under this section shall be computed in accordance with either of the following clauses:

(i) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

(ii) the party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just.

(B) In any case in which the court finds that the violation was committed willfully and for purposes of commercial advantage or private

against both Sykes and Noel, denied Cablevision's motions for summary judgment and dismissed its claims against Sykes and Noel pursuant to 47 U.S.C. § 605,[2] awarded Cablevision statutory damages of $250 against each defendant-appellee pursuant to § 553(c)(3)(A)(ii), and denied Cablevision's

financial gain, the court in its discretion may increase the award of damages, whether actual or statutory under subparagraph (A), by an amount of not more than $50,000.

(C) In any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $100.

2. As pertinent to the issues presented on this appeal, § 605 provides:

**(a) Practices prohibited**

Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

. . . .

**(e) Penalties; civil actions; remedies; attorney's fees and costs; computation of damages; regulation by State and local authorities**

. . . .

(3) (A) Any person aggrieved by any violation of subsection (a) of this section or paragraph (4) of subsection [(e)] of this section may bring a civil action in a United States district court or in any other court of competent jurisdiction.

(B) The court—

(i) may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a) of this section;

(ii) may award damages as described in subparagraph (C); and

(iii) shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails.

(C) (i) Damages awarded by any court under this section shall be computed, at the election of the aggrieved party, in accordance with either of the following subclauses;

(I) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

(II) the party aggrieved may recover an award of statutory damages for each violation of subsection (a) of this section involved in the action in a sum of not less than $1,000 or more than $10,000, as the court considers just, and for each violation of paragraph (4) of this subsection involved in the action an aggrieved party may recover statutory damages in a sum not less than $10,000, or more than $100,000, as the court considers just.

(ii) In any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation of subsection (a) of this section.

(iii) In any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $250.

(4) Any person who manufactures, assembles, modifies, imports, exports, sells or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both. For purposes of all penalties and remedies established for violations of this paragraph, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation.

applications for injunctive relief, attorney fees, and costs.

Vacated and remanded for the provision of relief pursuant to § 605.

## Background

This appeal presents for decision the applicability of § 605 to the sale of devices known as "pirate" cable descramblers or "black boxes." The facts pertaining to Cablevision's suit against Sykes are described in a previous opinion by this Court. *See International Cablevision, Inc. v. Sykes,* 997 F.2d 998, 1000–03 (2d Cir.1993). Those pertaining to the suit against Noel are outlined in the district court opinion from which this appeal is primarily taken. *See International Cablevision, Inc. v. Noel,* 859 F.Supp. 69, 71–72 (W.D.N.Y.1994). Familiarity with both opinions is assumed.

Cablevision sells cable television programming which it delivers to its customers from the system headend via coaxial ground cable. The headend "has parabolic or other appropriately shaped antennas for receiving satellite-delivered program signals, high-gain directional antennas for receiving distant TV broadcast signals, directional antennas for receiving local signals, machines for playback of taped programming and commercial insertion, and studios for local origination and community access programming." Walter S. Ciciora, *Cable Television in the United States: An Overview* 9 (Cable Television Laboratories, Inc., Louisville, Colorado, rev. 2d ed. 1995).

Customers purchase a package of channels termed "basic service" from Cablevision for a minimum flat rate, and may purchase additional "premium" channels, such as HBO or Showtime, for a higher fee. Although both basic service and premium channels are transmitted to all subscribers' homes, Cablevision scrambles the signals for premium channels and provides a "descrambler" or "decoder" only to customers paying for premium service. However, a subscriber paying for basic service can gain access to premium channels by purchasing a "pirate" descrambler or "black box" from a source other than Cablevision.

In October 1990, Sykes sold a pirate descrambler for $250 to Sandra Helsel, a private investigator sent to his place of business by Cablevision, who tape recorded her conversation with Sykes. Helsel asked him for "a guarantee or warranty of some kind," and Sykes assured her that: "Any problems at all let me know.... Otherwise, like I said I got a thousand of them if I don't have one." Helsel then asked if she could get another one, and Sykes replied: "Yes. I've got 15/20 all the time."

Cablevision instituted a civil action against Sykes alleging violations of §§ 553 and 605 (as well as various provisions of New York law), and moved for summary judgment on its federal claims. Cablevision submitted an affidavit by Helsel and a transcript of the recorded conversation with Sykes in support of its motion for summary judgment.

In opposition, Sykes provided an affidavit in which he admitted that he had sold the descrambler to Helsel, but claimed that he had purchased it for approximately $250 at the behest of a special agent of the Federal Bureau of Investigation (the "FBI") with the understanding that the agent would reimburse him for the purchase. When Sykes was told that he would not be reimbursed, he sold it to Helsel for no profit.

FBI Special Agent Glen C. Reukauf provided an affidavit stating that some years earlier, in 1987, Sykes had advised him that certain local individuals had developed a device to descramble an encryption scheme recently adopted by Cablevision, and that Sykes had furnished Reukauf with such a device. Reukauf noted that he had been unaware at the time that Sykes had purchased the descrambler with personal funds (but rather had surmised that it had been lent to Sykes), and asserted that although he had returned the descrambler to Sykes, he had never authorized Sykes to resell it.

In a decision dated February 5, 1992, the district court denied Cablevision's motion for summary judgment, stating that:

> The fact that Mr. Sykes sold the box to Ms. Helsel is not contested, and it was clear from her affidavit that Sykes knew what the device was, what it would do, and that he clearly intended to violate the law.

If that was the only evidence before the court, the plaintiff would be entitled to a motion for summary judgment.

However, there is a dispute as to when the device came into the possession of Mr. Sykes and the manner in which it came into his possession. If in fact he acted in behalf of the government in obtaining the device, there may be a good defense to this action. There must be a trial or hearing to resolve this material fact which is in dispute.

After a one-day bench trial, the district court dismissed the complaint, stating that the effort which Sykes had made to get in touch with the FBI agent to inform him of the piracy and to obtain a descrambler had benefited Cablevision, and that Sykes had "perhaps ... acted foolishly ... and sold the device ... to the investigator," but "there is no evidence here that there was any dealing for gain." The district court further found that Sykes' statements that he had many more descramblers were "part of the sale[s] pitch which he used with the investigator to get rid of the box," and concluded that the box had been "sold with the innocent purpose of ... recouping ... losses."

Cablevision appealed, and we vacated and remanded in *Sykes*. Rejecting the district court's determination that no violation of § 553 had occurred, we opined that "§ 553(a)(1) contains no suggestion that its prohibition was meant to extend only to persons who are engaged in the continuing business or repeated conduct of selling [descrambling] devices," and that "there is no suggestion whatever in § 553(a)(1) that in the absence of financial gain there is no violation." 997 F.2d at 1004.

We then addressed § 605, noting that "the applicability of § 605 to the present case was not explored below, apparently because both sides and the district court assumed that both that section and § 553 were applicable," 997 F.2d at 1009, but stating that we considered the applicability of § 605 "unclear," 997 F.2d at 1007. We observed that the question was material because, as a result of 1988 amendments to § 605, the remedies available in a civil suit thereunder were considerably more severe than those available under § 553. 997 F.2d at 1007; *compare* § 553(c)(3), *supra* note 1, *with* § 605(e)(3)(C), *supra* note 2.

After reviewing the pertinent statutory language and legislative history, we concluded that:

> [I]t may be that Congress intended that to the extent that a device is sold to assist in the theft of signals directly from a satellite, § 605(e)(4) would apply; that if the theft is of signals transmitted by radio waves, § 605(a) would apply; and that when the theft is of a signal transmitted by coaxial cable, § 553(a)(1), and not § 605, would apply.
>
> If this was Congress's intended scheme, it is hardly clear that Sykes's conduct violated § 605. As indicated in Part I above, Cablevision's distribution of cable programming involves several types and stages of communication, including receipt of signals from satellite, transmission via radio, and retransmission over coaxial cable wiring. From the instruction sheet that Sykes gave Helsel, which was introduced at trial, it appears that Sykes's box was designed only for intercepting cable wire transmissions, not for intercepting satellite or radio signals prior to their conversion to a form suitable for transmission over coaxial cable. Thus, it may be that only § 553, not § 605, was applicable to his conduct.

997 F.2d at 1009.

Noting that the § 605 issue had neither been considered by the district court nor briefed on appeal, however, we vacated and remanded for the district court "in the first instance, if Cablevision wishes to pursue its claim under § 605, to determine the applicability of that section." 997 F.2d at 1009. We added that "[i]f [§ 605] was violated and Cablevision was aggrieved thereby, the [district] court should grant Cablevision's request for damages under § 605(e) instead of granting the lesser damages available under § 553." *Id.* Finally, we ruled that an award of attorney fees is mandated for a violation of § 605, but discretionary as to a violation of § 553. *Id.* at 1009–10; *compare*

§ 553(c)(2)(C), *supra* note 1, *with* § 605(e)(3)(B)(iii), *supra* note 2.

Cablevision had commenced its action against Noel on July 8, 1991. By the time of our remand in *Sykes,* Cablevision's motions for summary judgment and Noel's motion to dismiss Cablevision's claims under § 605 were pending in the *Noel* action. Accordingly, the district court consolidated the cases for joint briefing.

Noel had sold two pirate descramblers that he had obtained from a company in Chicago, Illinois to Ann Crowley and Darleen Lake, investigators for Cablevision, for $300 each in April 1991. Unbeknownst to Noel, the investigators tape recorded their conversation with him during the second sale. During the taped conversation, Noel explained how to connect the descrambler, told the investigators to be careful who they talked to about the unit and to hide it from the cable company, and added that it was "illegal." Noel also told the investigators that "I don't sell that many [descramblers], just once in a while." Crowley and Lake signed a statement which asserted that at the time of the first sale, Noel told them that he didn't make any money selling descramblers, but "just like[d] to screw the cable company."

Addressing the pending motions in *Noel,* the district court turned first to the issue of Noel's liability under §§ 553 and 605. The court noted that Noel had conceded liability under § 553. 859 F.Supp. at 72. The court then addressed the provisions of § 605(e)(4), *see supra* note 2, and concluded that it was required to ascertain "whether the descramblers [Noel] sold were either (i) 'primarily of assistance in the unauthorized decryption of satellite cable programming,' or (ii) intended for use in any of the various other activities prohibited by 47 U.S.C. § 605(a)." 859 F.Supp. at 72 (quoting § 605(e)(4)); *see also* § 605(e)(3)(A) (establishing civil action for any person aggrieved by a violation of § 605(a) or (e)(4)), *supra* note 2.

The court ruled that the descramblers sold by Noel were not "primarily of assistance in the unauthorized decryption of satellite cable programming" within the meaning of § 605(e)(4) because:

"Satellite cable programming" is defined in § 605(d) as "video programming which is *transmitted via satellite* and which is primarily *intended for the direct receipt by cable operators for their retransmission* to cable subscribers." 47 U.S.C. § 605(d)(1) (emphasis added). The plain meaning of this language is that the term refers to over-the-air satellite signals *before* their receipt by cable operators. It is clear that the signals must be *intended for receipt* by the operators; however, once they have been received and retransmitted to subscribers through coaxial cable, they no longer fall within the definition. *United States v. Norris,* 833 F.Supp. [1392,] 1398–1399 [ (N.D.Ind.1993) ].

859 F.Supp. at 77.

The court also concluded that Noel had not violated § 605(a) by selling the two descramblers to Crowley and Lake. The court noted that both § 553 and the provision that ultimately became § 605(e)(4) had been enacted as part of the Cable Communications Policy Act of 1984 (the "1984 Act"), Pub.L. No. 98–549, 98 Stat. 2779, while the existing § 605 was retained without alteration as § 605(a). 859 F.Supp. at 72–73. The court discounted several cases that antedated the enactment of the 1984 Act and had interpreted § 605 as affording protection to television signals transmitted via coaxial cable because:

First, the statutory language itself fails to establish that § 605(a) prohibits the interception and decryption of television signals transmitted via cable. And second, interpretation of § 605(a) as encompassing the theft of cable-borne signals would render Congress' enactment of § 553 superfluous, and would require an unnecessarily strained reading of the legislative history of §§ 553 and 605(e)(4).

859 F.Supp. at 73.

The court separately addressed each of the first three sentences of § 605(a), set forth *supra* at note 2, in concluding that § 605(a) did not apply to the interception of cable-borne television signals, 859 F.Supp. at 73–75, and also reviewed the legislative history of the 1984 Act as it bears upon the issue, *id.* at 75–76.

Concluding that only § 553 was applicable to Noel's descrambler sales, the court awarded the minimum of $250 damages authorized by § 553(c)(3)(A)(ii) for Noel's violations, declining to apply the reduction to no less than $100 damages authorized by § 553(c)(3)(C) "where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of [§ 553]." 859 F.Supp. at 77–79. The court denied injunctive relief to Cablevision, *id.* at 79, and did not separately address the issue of attorney fees.

Immediately thereafter, the court issued a brief opinion disposing of Cablevision's claims against Sykes in accordance with the court's prior decision in *Noel. International Cablevision, Inc. v. Sykes,* No. 90–CV–1272C, slip op. (W.D.N.Y. Aug. 11, 1994). Cablevision's claims under § 605 were dismissed, slip op. at 1, statutory damages of $250 pursuant to § 553(c)(3)(A)(ii) were awarded, slip op. at 2, and attorney fees and injunctive relief were denied, *id.* at 2–3.

This consolidated appeal followed.

### Discussion

Cablevision contends on appeal that § 605 applies to the sales of descramblers made by Sykes and Noel, and alternatively that the district court abused its discretion with respect to the measure of relief provided to Cablevision pursuant to § 553 against Sykes and Noel. We conclude that (subject to a reservation stated *infra* at note 5) Sykes and Noel violated § 605, and accordingly that we must remand for the imposition of "damages under § 605(e) instead of ... the lesser damages available under § 553," *Sykes,* 997 F.2d at 1009, as well as a mandatory award of attorney fees pursuant to § 605, *id.* at 1009–10. Accordingly, we do not address the issue of damages under § 553.

Our analysis begins with the following definitions from the Communications Act of 1934, Pub.L. No. 416, 418 Stat. 1064, 1065 (the "1934 Act"), codified at 47 U.S.C. § 153:

For the purposes of this chapter, unless the context otherwise requires—

(a) "Wire communication" or "communication by wire" means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

(b) "Radio communication" or "communication by radio" means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

As will appear, the pivotal question on this appeal is whether the descramblers sold by Sykes and Noel were intended to be used to "receive ... any ... communication by radio" within the meaning of the third sentence of § 605(a), an inquiry that requires examination of the definition of "communication by radio" in § 153(b). Some preliminary explication is required, however, in order to isolate this central issue for resolution.

Section 605(e)(3)(A) provides a civil action to "[a]ny person aggrieved by any violation of [§ 605(a)] or [§ 605(e)(4)]." Section 605(e)(4) imposes criminal liability upon "[a]ny person who ... distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by [§ 605(a)]." "Satellite cable programming" is defined by § 605(d)(1) to mean "video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers." *See supra* note 2.

The first sentence of § 605(a) prohibits persons "receiving, assisting in receiving, transmitting, or assisting in transmitting ... any interstate or foreign communication by wire or radio" from divulging or publishing the contents of that communication except in specified, authorized ways. The second sentence prohibits any "person not being autho-

rized by the sender" from "intercept[ing] any radio communication and divulg[ing] ... [its] contents ... to any person." The third sentence prohibits any "person not being entitled thereto [from] receiv[ing] or assist[ing] in receiving any interstate or foreign communication by radio and us[ing] such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." *See supra* note 2.

Section 605 was initially enacted as § 605 of the Communications Act of 1934, Pub.L. No. 416, 48 Stat. 1064, 1103. As originally enacted, the first and third sentences of present § 605(a) made reference to "communication by wire or radio," while the second sentence referred to "any communication." In connection with passage of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197, tit. III (Wiretapping and Electronic Surveillance), codified at 18 U.S.C. § 2510 *et seq.* (the "1968 Act"), however, Congress deleted the reference to communication "by wire" in the third sentence of present § 605(a), and changed the phrase "any communication" to "any radio communication" in the second sentence. In addition, the designations (1) through (6) were added to the existing provisions of the first sentence, as well as the introductory clause: "Except as authorized by chapter 119, Title 18." Minor editorial changes to § 605 were also made at that time. *See* Pub.L. No. 90–351, § 803, 82 Stat. 223.

Although the 1968 amendments might have been read to remove the receipt or interception of cable-borne television signals from the purview of the second and third sentences of § 605 (now § 605(a)), the courts did not construe those provisions in this manner when the issue was presented to them. Rather, the case law was to the contrary.

The first such case, *Porter County Cable Co. v. Moyer,* 624 F.Supp. 1 (N.D.Ind.1983), cited the second and third sentences of § 605(a) as applicable to the sale of electronic descramblers for use in intercepting premium cable television services. *See* 624

F.Supp. at 3. The case was decided on an unopposed motion for summary judgment. *See id.* at 2. It relied upon two prior cases that dealt with the interception of over-the-air, rather than cable-borne, subscription television services. *See id.* at 3.

*Cox Cable Cleveland Area, Inc. v. King,* 582 F.Supp. 376 (N.D.Ohio 1983), next made such a ruling, citing cases that dealt with the unauthorized interception of over-the-air subscription television, *id.* at 380, and stating that "[s]ection 605 prohibits the divulgement or publication of *wire communications* which are not intended for the general public," *id.* (emphasis added). As previously noted, as a result of the amendments made to § 605(a) by the 1968 Act, only the first sentence of § 605(a) makes any reference to "wire" communications.

*Ciminelli v. Cablevision,* 583 F.Supp. 158 (E.D.N.Y.1984), incorporated, appended, and relied upon an immediately prior ruling by the same court in *Cablevision v. Annasonic Electronic Supply,* No. CV–83–5159 (E.D.N.Y. Feb. 10, 1984), to reject the argument that "[s]ection 605 does not apply to the interception of wire transmissions or communications." *See* 583 F.Supp. at 160–61. *Ciminelli* also cited in support of its ruling *Porter, Cox Cable,* and *National Subscription Television v. S & H TV,* 644 F.2d 820, 826–27 (9th Cir.1981), a case dealing with the interception of over-the-air subscription television. 583 F.Supp. at 161.

Finally, *Annasonic* stated three rationales for concluding that § 605 applies to the interception of cable-borne, as well as over-the-air, pay television. First, "[t]he system of coaxial cable used to facilitate final delivery of the signal to subscriber homes, does not change the nature of the stolen transmission itself." 583 F.Supp. at 164. Second, the court pointed to the first sentence of § 605(a) as prohibiting such interceptions. *Id.* Third, the court disparaged the likelihood that the 1968 Act would have excepted cable-borne television from the proscription of § 605(a) without providing any substitute proscription under the 1968 Act.[3]

---

**3.** A provision of the 1968 Act, 18 U.S.C. § 2520, provides a civil remedy to any person whose wire

communication is intercepted in violation of the 1968 Act, but § 2520 had been construed in *Cox*

In *Noel*, the district court rejected these cases and their interpretation of § 605(a). It regarded the first sentence of that provision as "intended to regulate the conduct of *communications personnel—i.e.*, those legitimately involved in transmitting or receiving radio or wire communications—rather than to address the problem of unauthorized interception or reception of communications." *Noel*, 859 F.Supp. at 75 (citing Sen.Rep. No. 1097, 98th Cong., 2d Sess. 108, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2197; *Edwards v. State Farm Ins. Co.*, 833 F.2d 535, 540 (5th Cir.1987)). It deemed the 1968 amendments to the second and third sentences of § 605(a) to have removed wire communications from their purview, and viewed the contrary judicial interpretations as having " 'stretched the language of § 605 to apply to the advanced technologies of the 1980s.' " *Id.* (quoting *United States v. Norris*, 833 F.Supp. 1392, 1400 (N.D.Ind.1993), *aff'd on other grounds*, 34 F.3d 530 (7th Cir.1994)).

This is certainly a plausible reading of the impact of the 1968 Act upon § 605. We note in this regard the following statement from the legislative history of the 1968 Act: "This section is not intended merely to be a reenactment of section 605. The new provision is intended as a substitute. The regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code." S.Rep. No. 1097 at 107, *reprinted in* 1968 U.S.C.C.A.N. 2196.

Nonetheless, the pre-1984 decisions provide another plausible interpretation of at least the third sentence of § 605(a).[4] *See Sykes*, 997 F.2d at 1007 (deeming third sentence of § 605(a) the "pertinent" provision). The continued transmission of radio signals via cable after their receipt at the headend of

a cable television system can be regarded as the "receipt, forwarding, and delivery of [radio] communications ... incidental to [the transmission]" of the pictures and sounds transmitted by those communications within the meaning of § 153(b).[5] *See Annasonic*, 583 F.Supp. at 164 ("The system of coaxial cable used to facilitate final delivery of the signal to subscriber homes, does not change the nature of the stolen transmission itself."). This interpretation may be deemed to have been adopted by Congress when it reenacted § 605(a) without change (except for labelling it as subsection (a) of an expanded § 605) in the course of adopting the 1984 Act. *See Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.") (collecting cases); *Shapiro v. United States*, 335 U.S. 1, 16, 68 S.Ct. 1375, 1383, 92 L.Ed. 1787 (1948) (same); *Trichilo v. Secretary of Health & Human Servs.*, 823 F.2d 702, 706 (2d Cir.1987) (same); 2A Norman J. Singer, *Sutherland Statutory Construction* § 45.12, at 62 (1992 revision) (same).

The applicability of this canon of construction is attenuated in this case, however, because the pertinent pre-1984 cases did not closely examine the language of § 605(a) as amended by the 1968 Act, and we regard as dubious the applicability of the first two sentences of § 605(a) to the sale of descramblers for cable-borne television signals. *See supra* note 4. The canon nonetheless provides some support for construing § 605(a) in accordance with the pre-1984 cases, and that support is strongly fortified by the legislative history of the 1984 Act.

---

*Cable* as providing no remedy to the operator of a cable television system against a purveyor of descrambling devices for interception of that system because of applicable definitional provisions of the 1968 Act. *See* 582 F.Supp. at 381–83.

**4.** The first sentence of § 605(a) is probably directed at communications personnel, as the district court indicated in *Noel*. *See* 859 F.Supp. at 75. The second sentence requires not only the interception of a "radio communication," but also its publication to a third party; descramblers are not ordinarily intended to facili-

tate *both* interception *and* publication to a third party.

**5.** As noted at the outset of this opinion, not all programming distributed from the headend of a cable television system originates as a radio communication. Thus, if it could be proved in a particular case that the interception at issue, or the distribution of a descrambler for the purpose of such interception, would not involve any radio-originated communications, only § 553, and not § 605, would be violated in that case.

As previously noted, § 553 was enacted as part of the 1984 Act, and existing § 605 was retained without alteration as § 605(a). H.R.Rep. No. 934, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 4655, contains the following statement in its section-by-section analysis of § 553:

Existing section 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communications services. *Nothing in [§ 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service.*

Section [553] sets forth a liability provision specifically applicable to theft of services offered over a cable system, while also providing specific criminal penalties and civil remedies for violations of the section. [Section 553(a)(1) ] prohibits any person from intercepting or receiving, or from assisting in the interception or reception of, any service offered over a cable system, unless the cable operator specifically authorizes the reception, or it is otherwise specifically authorized by law.

The Committee intends the phrase "service offered over a cable system" to limit the applicability of [§ 553] to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, *continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.* The Committee further intends that the term "any communications service" include, for example, audio, video, textual, data, or other service offered over a cable system, including any material transmitted to or from a subscriber over a cable system that has interactive capability.

H.R.Rep. No. 934 at 83, *reprinted in* 1984 U.S.C.C.A.N. 4720 (emphasis added).

Although the issue is not entirely free from doubt, the more likely reading of this legislative history is that in view of the uniform prior judicial interpretation of § 605 as applicable to the theft of cable service, the first emphasized passage in the above quotation was intended to make clear that § 605 would continue to be so applicable. Although the second emphasized passage might be read to undercut this interpretation of the first passage, it is in our view more plausible to consider the second passage as establishing § 605's exclusive jurisdiction over the transmission of a television signal by radio prior to the transmission of that same signal by cable, rather than as barring the application of § 605 to the subsequent cable transmission of the signal.

Further, legislative history subsequent to the House report strongly confirms the latter interpretation. On the day that the 1984 Act was adopted by both houses of Congress, Senator Robert W. Packwood, chairman of the Senate Committee on Commerce, Science, and Transportation (the committee responsible for the legislation), delivered a statement that adopted "the explanation of [the 1984 Act] contained in House Report 98–934, ... with the modifications that follow." 130 Cong.Rec. S14285 (daily ed. Oct. 11, 1984) (statement of Sen. Packwood), *reprinted in* 1984 U.S.C.C.A.N. 4738. Senator Packwood's statement included the following:

H.R. 4103 as reported by Committee recodifies without modification section 605 to the Communications Act of 1934 as new section [605](a). *In amending existing section 605, it is intended to leave undisturbed the case law that has developed confirming the broad reach of section 605 as a deterrent against piracy of protected communications.* Over the years federal courts, consistent with congressional intent, have recognized that section 605 provided broad protection against the unauthorized interception of various forms of radio communications. *It is the Committee's intention* that the amendment preserve these broad protections; *that all acts which presently constitute a violation of present section 605 shall continue to be unlawful under that section as amended and redesignated by H.R. 4103.*

Section 605 not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by means of new technologies. For example, existing section 605 provides protection against the unauthorized reception of subscription television (STV), multipoint distribution services (MDS), and satellite communications. This amendment made by section 5 of the bill is *intended to preserve this broad reach of existing section 605 and to make clear that all communications covered under section 605 will continue to be protected under new section [605](a).*

Moreover, existing section 605 is not limited to holding liable only those who, without authorization, actually receive a particular communication. Those who "assist" (including sellers and manufacturers) in receiving such communications are similarly liable under section 605, and *it is intended that this liability also remain undisturbed by this amendment.*

130 Cong.Rec. S130, *reprinted in* 1984 U.S.C.C.A.N. 4746 (emphasis added). That same day, the Senate concurred in the House amendments with amendments, and the House concurred in the Senate amendments. *See* 98 Stat. 2806.

■ In light of this legislative history and the uniform pre-1984 judicial interpretation of § 605 as applicable to the distribution of descramblers for the interception of cable television, we conclude that § 605 continues to apply to such distribution, and therefore to the conduct of Sykes and Noel that is at issue on this appeal. We note that this result does not lead to a complete overlap between the coverage of §§ 605 and 553. Section 605 applies to a considerable body of radio transmissions to which § 553 is inappli-

cable, while § 553 applies to any transmissions via cable, whether or not they originate as radio transmissions. *See supra* note 5; *see also* H.R.Rep. No. 938 at 83, *reprinted in* 1984 U.S.C.C.A.N. 4720 ("[T]he term 'any communications service' [in § 553(a)(1)] include[s] ... audio, video, textual, data, or other service offered over a cable system, including any material transmitted to or from a subscriber over a cable system that has interactive capability."). Although the resulting interplay and overlap between §§ 553 and 605 may not demonstrate "a convenient and inviting sense of order," *Cablevision Sys. Corp. v. Muneyyirci,* 876 F.Supp. 415, 425 (E.D.N.Y.1994),[6] it is for Congress, not the courts, to address any perceived resulting disorder. *See id.*

■ In our view, finally, the more severe statutory penalties provided by § 605(e)(3)(C)(i)(II), *see supra* note 2, for violations of § 605(e)(4) apply in this case. A violation of § 605(e)(4) occurs upon the distribution of a descrambler with knowledge (or reason to know) "that the [descrambler] is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by [§ 605(a)]." Thus, the act of distribution for either of the above purposes incurs the heavier penalties provided by § 605(e)(3)(C)(i)(II), while the subsequent act of interception (or assistance in interception) is a violation of the third sentence of § 605(a) and incurs the lesser penalties provided by § 605(e)(3)(C)(i)(II).

## Conclusion

The judgment of the district court is vacated and the case is remanded for the imposi-

6. We note that *Muneyyirci,* 876 F.Supp. at 420–25, agrees with our analysis of the interplay between §§ 553 and 605, as does *General Instrument Corp. v. Lake Sylvan Sales, Inc.,* No. CIV. A. 93–3856, 1993 WL 496588, at *2–4 (E.D.Pa. Nov. 30, 1993), while *Norris,* 833 F.Supp. at 1397–1401, 1403–04 (on reconsideration), does not. The Seventh Circuit did not address the issue in affirming *Norris. See* 34 F.3d at 532–33. A number of post-1984 cases have affirmed the application of § 605 to piracy of cable-borne television signals without extended consideration of the issues addressed in this appeal, *Sykes,*

*Muneyyirci, General Instrument Corp., Noel,* and *Norris. See, e.g., ON/TV of Chicago v. Julien,* 763 F.2d 839, 844 (7th Cir.1985); *Time Warner Cable v. Freedom Elecs., Inc.,* 897 F.Supp. 1454, 1459 (S.D.Fla.1995); *Oceanic Cablevision, Inc. v. M.D. Elecs.,* 771 F.Supp. 1019, 1025 (D.Neb.1991); *Shenango Cable TV, Inc. v. Tandy Corp.,* 631 F.Supp. 835, 837 (W.D.Pa.1986); *Cablevision Sys. Corp. v. DePalma,* No. CV–87–3528 (JLC), 1989 WL 8165, at *3 (E.D.N.Y. Jan. 17, 1989); *Cablevision Sys. Dev. Co. v. Cohen,* No. 84 CV 1155 (ERK), slip op. at 7 n. 1 (E.D.N.Y. Apr. 21, 1988).

tion of statutory damages and mandatory costs, including attorney fees, in accordance with § 605(e)(3)(C)(i) and (e)(3)(B)(iii). *See Sykes,* 997 F.2d at 1009–10. Appeal costs to Cablevision.