Hon. Cathy Ann Bencivengo, United States District Judge
This matter is before the Court on Defendant's motion for summary judgment. The motion has been fully briefed, and the Court deems it suitable for submission without oral argument. The motion is denied.
I. Background
Plaintiff G & G Closed Circuit Events, LLC ("G & G") is a closed circuit distributor of sports and entertaining programming that purchased and retained the exclusive commercial exhibition (closed circuit) licensing rights to Gennady Golovkin v. Saul Alvarez IBF World Middleweight Championship Fight Program (the "Program"), which occurred on Saturday, September 16, 2017. There is no dispute that the Program was shown that night at Cotija Mex Grill a/k/a Cotijas Taco Shop, located at 3695 Fairmount Ave, San Diego, California ("Cotija"), without authorization from G & G. [Doc. No. 23-4 at 31-32; Doc. No. 24-3 at 6-9.][1]
Based on these facts, G & G filed this suit against David Gonzalez Ruiz, doing business as Cotija. The complaint asserts four claims: (1) violation of 47 U.S.C. § 605 ; (2) violation of 47 U.S.C. § 553 ; (3) conversion; and (4) violation of California Business and Professions Code § 17200.
II. Legal Standard
The familiar summary judgment standard applies here. Under Federal Rule of Civil Procedure 56, the court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a). To avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be *1063 such that a reasonable judge or jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; Cline v. Indus. Maint. Eng'g & Contracting Co. , 200 F.3d 1223, 1229 (9th Cir. 2000) (citing Anderson , 477 U.S. at 248, 106 S.Ct. 2505 ). When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n , 809 F.2d 626, 630 (9th Cir. 1987).
III. Discussion
Although Ruiz's motion seeks summary judgment on the entire lawsuit, the motion completely ignores the state law claims and directs all of its arguments to the two federal claims. Ruiz acknowledges the state law claims for the first time on the reply, arguing that they are premised on the federal claims and that even if the Court does not grant summary judgment on the state law claims, it should, upon granting summary judgment on the federal claims, decline to exercise supplemental jurisdiction over the state law claims and dismiss them on that ground. Because these arguments were not raised in the motion itself, the Court need not consider them here. Zamani v. Carnes , 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Regardless, because, as discussed below, Ruiz is not entitled to summary judgment on the federal claims, these arguments as to the state law claims are moot.
As for the federal claims, Ruiz does not dispute that the Program was shown at Cotija on September 16, 2017, without authorization from G & G, but he argues nevertheless that that summary judgment is warranted for three reasons. First, Ruiz argues that he did not own or operate Cotija on the night the Program was shown. Second, Ruiz argues that 47 U.S.C. § 605 and 47 U.S.C. § 553 do not apply here because the Program was displayed at Cotija using a feed obtained from the internet. Finally, Ruiz argues that G & G lacks standing to sue under its license agreement with the promoter because the Program was shown at Cotija on a time delay. None of these arguments are persuasive.
A. 47 U.S.C. §§ 553 and 605
Section 553 prohibits unauthorized interception of communications over a cable system:
No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
47 U.S.C. § 553(a)(1).
Section 605 concerns radio and satellite communications:
[N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is *1064 serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles, or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.
47 U.S.C. § 605.
Despite the plethora of district court opinions addressing claims of unauthorized broadcasts of pay-per-view sports programming in violation of these statutes, such cases rarely reach the circuit courts. Thus, there is little Circuit level authority discussing the scope and application of these statutes. In a case addressing relief from default judgments, however, the Ninth Circuit noted that "[t]here are potentially intricate issues of overlap and distinction between [ § 553 and § 605 ], one of which speaks more to cable television, the other more to satellite television," but did not consider the details of their respective applications. Kingvision Pay-Per-View Ltd. v. Lake Alice Bar , 168 F.3d 347, 349 n.1 (9th Cir. 1999). In an earlier case, the Second Circuit was slightly more definitive, holding that " Section 605 applies to a considerable body of radio transmissions to which § 553 is inapplicable, while § 553 applies to any transmissions via cable, whether or not they originate as radio transmissions." Int'l Cablevision, Inc. v. Sykes , 75 F.3d 123, 133 (2d Cir. 1996). Yet, that court also acknowledged that "the resulting interplay and overlap between §§ 553 and 605 may not demonstrate a convenient and inviting sense of order...." Id. (internal citation omitted). Ultimately, caselaw concerning the application of these statutes to unauthorized broadcasts of pay per view events exists almost exclusively in district court opinions.
B. Ruiz's Ownership or Operation of Cotija (or Lack Thereof)
Ruiz argues that he cannot be held liable under either section for any unauthorized broadcast of the Program because he did not own or operate Cotija on the night in question. In support of this argument, Ruiz offers declarations from himself and several others that Ruiz had leased Cotija to Enrique Hernandez from February 15, 2017 to December 1, 2017, which period included the night in question. [Doc. Nos. 23-1, 23-2, 23-3, 23-9.] The lease agreement itself is a barebones one-page document and is vague as to what exactly is being leased. [Doc. No. 23-5 at 2.] It labels Ruiz as the "Renter" and *1065 Hernandez as the "Tenant," and although it references Cotija, the lease does not explicitly define "Leased Premises." [Id. ] In addition, the lease gave Ruiz the right to enter and inspect the "Leased Premises," and it required Hernandez to comply with Ruiz's rules of the "Leased Premises." [Doc. No. 23-5 at 2.] Assuming the business of Cotija is the "Leased Premises," it is unclear how Ruiz could lease Cotija to Hernandez when Cotija, as a sole proprietorship, is legally indistinct from Ruiz. See J & J Sports Prods., Inc. v. Flores , 913 F.Supp.2d 950, 955-56 (E.D. Cal. 2012) ("The designation of 'DBA' or 'doing business as' simply indicates an entity operates under a fictitious business name. Use of a fictitious business name does not create a separate legal entity.") (citations and brackets omitted). In any event, "having chosen not to organize [his] business as a corporation or other form that would create a legal identity separate from its owner[ ], [he] may be held liable for its wrongdoing." J & J Sports Prods., Inc. v. Delgado , No. CIV. 2:10-2517 WBS KJN, 2012 WL 371630, at *4 (E.D. Cal. Feb. 3, 2012). Thus, that Hernandez may have been operating Ruiz's business of Cotija at the time does not allow Ruiz to avoid liability for any wrongdoing that happened at Cotija on the night in question. See id. (holding that sole proprietor could not "escape liability merely by stating that she was absent on the particular night in question or did not explicitly authorize the broadcast of the Program"). In other words, "evidence sufficient to create a genuine issue of material fact as to [Cotija's] liability automatically creates a genuine issue of material fact as to [Ruiz's] individual liability, without the need for a concomitant showing [Ruiz] had the right and ability to supervise the violation and an obvious and direct financial interest in it." Flores , 913 F.Supp.2d at 956.
Moreover, even if it were relevant whether Ruiz was operating the Cotija restaurant on the night in question, the lease to Hernandez is not dispositive of the issue. Ruiz's motion ignores contradictory evidence indicating that, notwithstanding the lease to Hernandez, Ruiz continued to control and operate Cotija. Ruiz was listed as the primary owner of Cotija on a query of the California Department of Alcoholic Beverage Control license system as of September 23, 2017. [Doc. No. 24-3 at 28.] He was billed for business tax on August 1, 2017 for Cotija, as a sole proprietorship. [Doc. No. 24-3 at 31.] The energy bill remained in Ruiz's name at least until July 17, 2017 [Doc. No. 24-3 at 33], and the water bill remained in Ruiz's name at least until August 16, 2017. [Doc. No. 24-3 at 35.] Indeed, in his own declaration, Ruiz stated that he instructed Hernandez not to show boxing programming on the television, implicitly acknowledging that Ruiz was in control Hernandez's operation of Cotija. [Doc. No. 23-2 at ¶ 3.] That Hernandez did not comply with Ruiz's instructions is irrelevant because Sections 553 and 605 are strict liability statutes. Delgado , 2012 WL 371630, at *3 ; see also J & J Sports Prods., Inc. v. Tamayo , No. 214CV01997KJMCKD, 2016 WL 2855126, at *4 (E.D. Cal. May 16, 2016) ("Whether defendants knew, authorized, or received any profit or financial benefit from the alleged signal piracy ... is irrelevant, if the defendants engaged in any piracy.").
Accordingly, because there is, at a minimum, a genuine dispute of material fact as to Ruiz's control and ownership of Cotija on the night in question, summary judgment is denied on this ground.
C. Application of §§ 553 and 605 to the Program Shown At Cotija
Ruiz argues that he is entitled to summary judgment because the Program was shown via the internet, meaning that neither section 553 nor section 605 applies. Neither party cites to any binding authority *1066 on the question of whether either of these federal statutes applies when a program is shown without authorization via the internet, and the Court could find no such authority on its own. However, after sifting through a number of district court opinions cited by the parties, the Court finds the reasoning in J & J Sports Productions, Inc. v. Jaschkowitz , No. 5:14-CV-440-REW, 2016 WL 2727015 (E.D. Ky. May 6, 2016), to be persuasive. The facts in Jaschkowitz are materially identical the facts here. There, the program, a boxing match between Manny Pacquiao and Juan Manuel Marquez, was shown "in a delayed manner from the Internet by using a smart phone connected to the projection television" in the bar. Jaschkowitz , 2016 WL 2727015, at *1. Here, according to Hernandez, the Program was shown at Cotija in similar fashion as a customer "instructed [him] how to hook up the projector to a computer and get the signal on the internet...." [Doc. No. 23-1 at ¶ 4.] Thus, the well-reasoned holding in Jaschkowitz warrants a similar result here.
The court in Jaschkowitz granted summary judgment in favor of the plaintiff that the defendant's actions violated section 605, holding that the bar:
divulged or published a received wire communication in violation of § 605 when it permitted [the bartender's boyfriend] to enter the establishment, plug his smart phone (which was connected to the Internet) into the projection television, and display the Program in a manner visible to bar patrons. Even if [the boyfriend] had personal permission or authority to receive and view the Program on his smart phone (a question of which this record does not permit full analysis), Plaintiff demonstrates that [the bar] did not have authorization to display the Program on its premises. [The bar], without authorization, after receiving or assisting in receiving the Program via [the boyfriend's] smart phone, divulged or published the Program via projection television. This violates § 605.
Jaschkowitz , 2016 WL 2727015, at *4. The same conclusion is warranted here. Regardless of whether Hernandez had personal permission to receive and view the Program over the internet (a question that the Court does not decide here), there was no authorization to display the Program to other patrons at Cotija. The display of the Program via projection television at Cotija therefore, at a minimum, violates § 605.[2] Cf. Nat'l Satellite Sports, Inc. v. Eliadis, Inc. , 253 F.3d 900, 917 (6th Cir. 2001) (holding that cable operator violated the first sentence of § 605(a) even though it did not intercept the event telecast in question because the cable operator divulged the telecast to an unauthorized person); J & J Sports Prods. Inc. v. Rubio , No. CV-16-01111-PHX-JJT, 2017 WL 3234939, at *2 (D. Ariz. July 31, 2017) ("The fact that Defendants may have somehow legally purchased a Sky Television subscription-a fact that is far from established-does not immunize them from liability for broadcasting the event to the Tacos El Grullo patrons without obtaining authorization from Plaintiff, the exclusive licensee."). Accordingly, Ruiz's motion for summary judgment on this ground is denied as well.
D. G & G's Standing Based on Its License Agreement for the Program
According to Hernandez, the Program "was broadcast [at Cotija] on a time *1067 delay (not live or simultaneous with the event itself)." [Doc. No. 23-1 at ¶ 4.] G & G's license agreement for the Program, meanwhile, made G & G the exclusive licensee of a "live simultaneous HBO-PPV telecast" of the Program. [Doc. No. 24-4 at 10.] Therefore, Ruiz argues, G & G lacks standing to sue for any unauthorized display of the Program at Cotija.
There are numerous flaws in this argument. First, Hernandez's declaration presents a conclusion without any facts to support the conclusion. Ruiz offers no evidence of what time the Program actually occurred and when it was actually displayed at Cotija. For this reason alone, the declaration is insufficient to warrant summary judgment on this issue.
Second, G & G offers a declaration from its investigator that he viewed the main event of the Program at Cotija between 7:54 pm PDT and 8:16 pm PDT on September 16, 2017. [Doc. No. 24-5 at 2-3.] G & G's opposition also includes a link to a live blog on the Sporting News website of the main event of the Program indicating that the boxers entered the ring around 7:56 pm PDT and that the first round ended at 8:12 pm PDT.[3] Thus, there is, at a minimum, a genuine dispute of fact as to whether there was any delay in the display of the Program at Cotija on September 16, 2017.
Regardless, Ruiz offers no authority for the proposition that any nominal delay between the actual fight and the unauthorized display thereof deprives G & G of standing to sue under its license agreement with the promoter. At a minimum, the Court interprets G & G's license agreement as giving it standing to sue for unauthorized broadcasts of the Program on the night the Program occurred live, even if those unauthorized broadcasts were subject to a slight transmission delay, as Ruiz contends here. Accordingly, summary judgment on this ground is denied as well.
IV. Conclusion
For the foregoing reasons, Ruiz's motion for summary judgment is DENIED.

Pinpoint cites to the record reference the ECF watermark page number unless otherwise specified.

Because Ruiz does not make distinct arguments with respect to each statutory section as to why summary judgment is warranted, the Court declines to analyze here whether the display of the Program also constitutes a violation of § 553.

See http://www.sportingnews.com/us/other-sports/news/canelo-vs-ggg-fight-results-live-updates-score-video-highlights-diaz-jr-de-la-hoya-undercard-odds-weigh-in/17ofviqxx8tgv1lou49r7b4n3s. Whether this live blog would be admissible at trial does not need to be decided here because the time the Program occurred could be presented in admissible form at trial. Fraser v. Goodale , 342 F.3d 1032, 1036-37 (9th Cir. 2003).