**TIME WARNER CABLE OF NEW YORK CITY, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P., Plaintiff,**

v.

**U.S. CABLE T.V., INC. d/b/a U.S. Cable TV, Zentek Corp., William C. Yeh, Karen Yeh, Theodore Orlando, John Does 1–10, Jane Does 1–10, Unidentified Corporations 1–10 and Unidentified Business Entities 1–10, Defendants.**

**Civil Action No. CV–95–2810 (DGT).**

United States District Court,
E.D. New York.

March 7, 1996.

**324**

Daniel J. Lefkowitz, William B. Jung, Patrick Sullivan, Jericho, NY, for Plaintiff.

Bennette D. Kramer, Schlam Stone & Dolan, New York City, for Defendants.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

This order, concerned with the distribution of unauthorized cable descrambling devices in violation of 47 U.S.C. §§ 553 and 605, finds defendants William Yeh, U.S. Cable T.V., and Zentek to have been in civil contempt of a Consent Judgment entered by this court on July 26, 1995 and assesses compensatory damages in the amount of $7,440,000 plus attorneys' fees and costs. It also orders plaintiff to accept a ten-year term on an otherwise mutually acceptable, revised permanent injunction.

### Background

**Procedural History**

On July 14, 1995 a complaint was filed by Time Warner Cable of New York (Time Warner) against two corporations, U.S. Cable and Zentek Corp. and their president, William Yeh, as well as some other individuals not involved in the present matter. As William Yeh effectively *is* U.S. Cable and Zentek, the court's references to him and to 'defendant' will, also, as appropriate, apply to those corporations. On July 18, 1995, this court granted Time Warner, ex parte, a Temporary Restraining Order authorizing seizure of business records, illicit sales proceeds and statutorily prohibited decoding devices. (The defendant corporations sold unauthorized descramblers, also called decoders, capable of translating encrypted signals received over cable wires. These devices are used by cable subscribers who pay only the basic fee to access premium and pay per view channels without additional payment to their cable company.)

On July 26, 1995, this court so ordered the parties' final Consent Judgment/permanent injunction, under which the defendants, William Yeh, U.S. Cable T.V. and Zentek, paid Time Warner $1,050,000 and they, "any of their servants, agents, employees, successors, assigns, affiliates and persons and/or entities acting on their behalf or acting in concert with them" were enjoined from:

(a) engaging in or assisting in the unauthorized interception of cable telecommunication programming services or signals (whether being transmitted to or from a cable television system through air or wire); (b) connecting, attaching, splicing into, tampering with or in any way using the cable wires or facilities of [Time Warner] for the purpose of gaining access to any cable television telecommunications programming services or signals without [Time Warner]'s express written authorization; and (c) manufacturing, selling, offering for sale, advertising for sale, distributing, importing, exporting, assembling, purchasing, transferring, obtaining, modifying, storing, or possessing any electronic equipment capable of descrambling (or equipment designed for descrambling purposes), intercepting, receiving, transmitting, retransmitting, or capable of making available all or part of any cable television telecommunication programming services or signals (whether being transmitted to or from cable television systems through the air or wire) without further Order of this Court . . .

This Consent Judgment settled actions pending in state and federal courts in Alabama in addition to the case before this court.

On August 22, 1995, this court granted Time Warner's request for an ex parte order to show cause, alleging the defendant was in civil contempt of court, because he had violated the permanent injunction ordered in July. This order permitted Time Warner to seize "certain cable television descrambling equipment . . . and the illicit sales proceed thereof in the amount of $77,032.00 by a bank check or certified check made payable to defendant Zentek Corp." Time Warner also requested modification of the permanent injunction to permanently restrain and enjoin defendant from engaging in any business transaction involving the cable television industry. Defendants U.S. Cable, Zentek and William Yeh do not contest the finding of civil contempt. Def. Brf. September 15, 1995, Tr. at 23.

On October 13, 1995, the court received testimony and documentary and physical evidence related to the activities that constituted the contempt for the purpose of determining damages. The parties also presented argument with regard to the appropriate measure of damages. Both parties submitted additional evidence following their appearances before the court. Plaintiff submitted an advertisement that appeared in the September 1995 *Popular Mechanics* magazine, advertising U.S. Cable's 800 number. The plaintiff also submitted documentation of its fees and costs. The defendant submitted U.S. Cables' telephone charges for its 800 number for the months immediately prior to its sale and an affidavit by Gary Curran regarding the attempted sale of descramblers in August. This evidence has been reviewed by the court, as have the parties' written analyses and discussions of the submissions.

**Contumacious Conduct**

*Importation and Proposed Sale of Descramblers to Cable Box Wholesalers*

Despite the terms of the permanent injunction contained in the settlement agreement so ordered by this court, in August 1995, Mr. Yeh decided to complete the importation of 8,500 Super Pioneer descramblers, ordered prior to the Consent Judgment, that were then being held in customs, paying a balance due of $25,000. He then attempted to distribute them to other sellers of unauthorized descramblers. He testified that he considered other alternatives such as returning the descramblers to their manufacturers. Although he may well have considered such an option, it is undisputed that, in the end, he rejected it. Yeh at 87, 109–13.

The customs documents indicate that one shipment of sixty-nine cartons arrived July 6, 1995 and was accepted August 9, 1995, while another, of 150 cartons, was accepted August 11, 1995. Ex. 8–A & 8–B, T. Allen at 75–78. Mr. Yeh's testimony that placed the acceptance at August 20, 1995 is simply unsupported by the documentary evidence and, even if true, would not lessen the offense of importation of the illegal devices contrary to the Consent Judgment. Yeh at 111–12.

The U.S. Cable general manager, Kim Vigil, inventoried the shipment, verified its condition, and then accepted the descramblers on behalf of U.S. Cable at the customs broker's warehouse. Vigil at 45. Yeh arranged for the sale of 4,000 descramblers to Cable Box Wholesalers (Cable Box), another descrambler merchant. He arranged with Vigil for Gary Curran, the president of Cable Box, to come inspect the descramblers, and, if Curran accepted them, to have him pay with a bank check. Vigil at 43–46, Yeh 105–09.

Unknown to Yeh, following the original seizure of U.S. Cable equipment on July 20, 1995, Vigil had informed Time–Warner's investigation agency, ACI, about Yeh's clearing this shipment through customs and his proposed sale of a portion of it to Gary Curran of Cable Box. Vigil at 33. ACI paid Ms. Vigil a total of $4,500 as an "informant fee," in two wire transfers, one dated August 23, 1995 and another August 31, 1995. Pltf.Affirm. of Costs, Ex. G. No evidence was presented, either at the hearing or thereafter, as to the nature of Vigil's agreement with Time Warner's investigators.

On August 23, 1995, the U.S. Marshal for the Southern District of Florida, pursuant to the order granted by this court on August 22, seized 8,500 descramblers held for U.S. Cable at a Customs Service International warehouse. The marshals also seized a check made payable to Zentek Corp., another of Yeh's corporations and also a defendant here.

Prior to the seizure, Yeh had contacted Curran about the descramblers and instructed him to bring a bank check. Yeh at 108–09. Curran had agreed with Yeh to purchase 4,000 of these 8,500 descramblers, subject to inspection. Yeh at 107–08. Vigil conducted the transaction with Curran for Zentek and Yeh. Vigil at 46–48. The seizure occurred immediately after an inspection of the descramblers by Gary Curran, president of Cable Box. Vigil at 43–47. The check was seized from Curran's briefcase located in his car when he went to the car to get it. Vigil at 47; Def.Aff. Date November 9, 1995, Ex. C Curran Aff.

Time Warner represents that Curran had approved the purchase for Cable Box and was headed for his car to pick up the check to render payment when he and the check were seized by the marshals. Defendant represents that Curran had not accepted the offer at the time of the seizure of the check. Defendant has submitted affidavits, first, from an attorney for Cable Box Wholesalers, and, post-hearing, from Curran himself, to that effect. In these affidavits, it is alleged that the marshal's search of Curran and seizure of the Cable Box' bank check from a locked briefcase inside a locked car was beyond the scope of the order and, hence, unconstitutional. The attorney's affidavit asserts that Curran was only returning to his car to obtain a knife to open the boxes and had not yet determined to purchase the descramblers. Def.Aff., dated September 15, 1995, Ex. A. After the hearing, defendant submitted an affidavit from Curran himself, essentially confirming the description of the transaction provided by his attorney. In addition, Curran's affidavit contains a number of self-serving statements with regard to Curran's lack of knowledge that his intended purchases were illegal that the court finds not credible in view of Cable Box's established business selling unauthorized cable descramblers. *Id.* ¶¶ 7–8. *See* Pltf.Ex. 4, Cable Box catalogue.

Following the seizure, Time Warner purchased a Super Pioneer descrambler from Cable Box for use in Time Warner's franchise area, the same model that was offered to Gary Curran of Cable Box at the customs warehouse in Florida. Time Warner offered documentary evidence to establish that three percent of Cable Box' sales were directed to Time Warner's franchisees. Pltf.Ex. 9.

*Transfer of Telemarketing Component of U.S. Cable to M.D. Electronics*

As part of Time Warner's investigation of defendant's compliance with the Consent Judgment, its investigator called U.S. Cable's 800 number. This call elicited a recorded message directing the caller to M.D. Electronics, and, in fact, connecting the caller to M.D. Electronics by simply pressing one button. B. Allen at 69. M.D. Electronics' catalog was provided as evidence that this company was also engaged in the sale of descramblers. Pltf.Ex. 6. Further testing to determine whether M.D. Electronics sold descramblers, the investigator purchased and obtained delivery of descramblers for use in Time Warner's franchise areas from the company. The M.D. Electronics salespersons acknowledged both that the descrambler was to be used illegally and that the purchase had resulted from the U.S. Cable referral. Pltf.Affirm., B. Allen Aff. ¶ 11–25, October 10, 1995.

An advertisement in the September 1995 *Popular Mechanics* magazine featured U.S. Cable's name, its 800 number, and its Florida address. Lefkowitz Ltr. dated October 31, 1995, Ex. B. Defendant has submitted documentation demonstrating that the advertisement appeared as the result of a year-long contract Yeh entered into in November 1994. It is undisputed that the advertisement was placed prior to the Consent Judgment. It may have been impossible to cancel, at the date of the Consent Judgment, July 26, 1995, the August and September 1995 publications, as the closing dates were respectively May 25, 1995 for August and June 23, 1995 for September. The August issue was on sale on July 11, 1995, well before the Consent Judgment and even the initiation of this action. Defendant represents that the September 1995 advertisement was the last that appeared. *See* Kramer Ltr. dated February 27, 1996, confirmed by Patrick Sullivan for plaintiff in conference call with Bennette Kramer and law clerk, February 28, 1996.

Yeh did not dispute the evidence that he had sold the 800 number to M.D. Electronics and, in fact, he introduced the agreement he had executed with Joseph Abboud, representing United Imports, Inc. Yeh at 92–94. Pltf.Ex. 10. (Yeh acknowledged that he "thinks" Abboud owns M.D. Electronics.) The letter was dated July 27, 1995, one day after the Consent Judgment. The letter contains a condition that Yeh must "provide, prior to closing, evidence that call volume on the 800 number has averaged no less than ten thousand (10,000) calls per month during the last six months, and that call volume exceeded 10,000 units during June, 1995." *Id.* ¶ 4. The letter also includes a noncompete clause, applicable to both U.S. Cable and Yeh, with regard to "the sale of cable television *decoders* or converters by mail order, or through mail order companies, for a period of one year following the closing date." *Id.* ¶ 6 (Emphasis added.). A further provision permits the purchaser to use "the content and format of your advertising," although not "the names U.S. Cable TV, Zentek, or any substantially similar names in any advertising." *Id.* ¶ 7.

Yeh stressed that he had sold the 800 number only as a way of disposing of the converters that Time Warner was to return to him. Yeh at 93–94, 99–100, 107. The court finds this motivation, although present, was only incidental to Yeh's intention to maximize his returns (or, essentially the same thing, minimize his losses) through the profitable liquidation of the remaining assets of U.S. Cable. His sale of the 800 number and the goodwill associated with it as well as his completion of the importation of the 8,500 descramblers in customs and his efforts to sell them, all compatible with liquidation of the business, unfortunately also indicate his lack of regard for his obligations under the Consent Judgment.

### Legal Analysis

Civil contempt findings were requested by the plaintiff and are conceded by Mr. Yeh. The Consent Judgment provided that this court retained jurisdiction for the purpose of enforcing compliance with its injunction and punishing violations. The hearing was held and evidence received for the purpose of determining the appropriate measure of damages. The issues to be addressed are, first, whether Time Warner's prompt seizure of the imported descramblers limits its damages to the costs of that investigation and seizure, as was argued by the defense; second, whether the sale of the 800 number to another known merchandiser of illegal descramblers was prohibited by the Consent Judgment; and, if so, third, what is an appropriate measure of the damage thereby incurred by the plaintiff when the actual amount of sales resulting to plaintiff's franchise cannot readily be determined. A fourth issue is whether a coercive fine is required to ensure that the defendant does not continue or resume participation in the sale of equipment in violation of 47 U.S.C. §§ 503 and 605. Lastly, a final issue concerns the duration of the modified proposed Consent Judgment about which the parties disagree, although they have reached agreement as to all other provisions. Defendant has also interposed objections to some attorneys' fees and costs presented by the plaintiff.

### Standard for Determining Penalties in Civil Contempt Proceeding

The financial relief granted in a civil contempt proceeding is ordinarily limited to damages sustained by the plaintiff and "an award of costs and attorneys' fees." "Civil contempt proceedings may yield a conditional jail term or fine. Civil contempt may also be punished by a remedial fine, which compensates the party who won the injunction for the effects of his opponent's noncompliance." *Hutto v. Finney,* 437 U.S. 678, 690–91, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1979). Imposition of a fee intended to punish the defendant rather than to induce compliance converts the action to that of criminal contempt and, in most instances, requires that the defendant be given the option of a jury trial. *See* 18 U.S.C. §§ 402, 3691. In civil contempt proceedings, then, "[f]ine and imprisonment are ... employed not to vindicate the public interest but as coercive sanctions to compel the contemnor to do what the law made it his duty to do." *Penfield Co. of California v. SEC,* 330 U.S.

585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947).

· Wright, Miller & Kane, in *Federal Practice and Procedure* §. 2960, state, concerning relief available in a civil contempt proceeding:

[Because] the ultimate object of the punishment [in civil contempt proceeding] is the enforcement of the rights and remedies of a litigant ... the relief granted ... is compensatory or conditional.... When a fine is imposed on someone who has been adjudged guilty of contempt, partly as compensation to the complainant and partly as punishment, the criminal feature of the order is dominant and fixes its character for purposes of appellate review.

■ As a result of these restrictions upon remedies available in civil contempt proceedings, the court is limited, in devising remedies for the defendant's contumacious conduct, to assessing the defendant to compensate Time Warner for damages it has incurred as the result of the defendant's contumacy and to imposing a fine or imprisonment for remedial purposes intended to coerce the defendant to do what the court finds he still refuses to do. Thus, if the court finds that the defendant is not continuing in his contumacious conduct, no penalty other than compensatory damages may be imposed. In civil contempt, the party fined or imprisoned must " 'carry the keys of their prison in their own pockets.' " *Penfield Co. of California v. SEC,* 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117 (1947) (quoting *In re Nevitt,* 117 F. 448, 461 (8th Cir.1902)). In other words, any fine imposed on Mr. Yeh must be contingent on his doing, or ceasing to do, specific·acts.

### Damages Resulting from Importation of Descramblers

■ It is undisputed that William Yeh took decisive steps to import approximately 8,500 illegal descrambler devices in violation of the Consent Judgment's specific prohibition of those actions. Judgment at 5. It is also undisputed that Time Warner took possession of all these descrambler devices before any sales were made to any end-users in its franchise areas who could have used the devices to obtain access to services for which they had not paid. The parties dispute whether a sale was or was not completed to another distributor of descramblers, Cable Box Wholesalers, but it is undisputed that Yeh at least attempted to sell 4,000 descramblers to that distributor.

In *International Cablevision, Inc. v. Sykes* (*Sykes II* ), 75 F.3d 123 (2d Cir.1996), the Court held that both 47 U.S.C. § 605 and § 553 provisions of relief were applicable to the sale of unauthorized cable descramblers. This resolved the question that had been raised, but not decided, by the court's earlier decision in the same case, *International Cablevision, Inc. v. Sykes* (*Sykes I* ), 997 F.2d 998 (2d Cir.1993), with regard to the applicability of § 605 relief to cable descrambler sales.

A violation of § 605(e)(4) occurs upon the distribution of a descrambler with knowledge (or reason to know) 'that the (descrambler) is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by § 605(a).' Thus, the act of distribution for either of the above purposes incurs the heavier penalties provided by § 605(e)(3)(C)(i)(II) [e.g., not less than $10,000 nor more than $100,000 per device], while the subsequent act of interception (or assistance in interception) is a violation of the third sentence of § 605(a) and incurs the lesser penalties provided by § 605(e)(3)(C)(i)(II) [e.g., not less than $1,000 nor more than $10,000 per device].

75 F.3d at 133 (quoting the statute).

Both 47 U.S.C. § 605(e)(3)(C)(i)(II) and § 553(c)(3)(A)(i) include statutory damage provisions. Both statutes provide remedies for "actual damages suffered by [aggrieved party] as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages." Section 553(c)(3)(B) provides that where violation is found to have been willful "and for purposes of commercial advantage or private financial gain, the court in its discretion may increase the award of damages ... by an amount of not more than $50,000." In § 553(c)(3)(A)(ii) statutory damages are provided in the

amount of $250 to $10,000 per violation. Pursuant to the amendment of the statute in 1992, § 553(b)(3) provides that "the prohibited activity established herein as it applies to each such device shall be deemed a separate violation."

Although the defendant could be assessed damages under either § 553 or § 605, as a result of the holding of the Second Circuit in *Sykes II*, the extreme acts of contumacy make the more severe provisions of § 605 seem appropriate, as they provide more adequate compensation for the plaintiff. It is clear that both of the defendant's contumacious offenses were acts relating to "distribution." Thus, the "heavier penalties provided by § 605(e)(3)(C)(i)(II)," *Sykes II* 75 F.3d at 133, that is, statutory damages of not less than $10,000 nor more than $100,000 per device, are applicable to defendant's actions.

Attorney for the plaintiff explained that Congress had enacted the statutory damages because of the difficulty in proving damages resulting from installation of a descrambler. Actual damages depend on "what kind of a television watcher is buying this." The device "can be used for many, many years.... It literally goes several thousands of dollars can be stolen each month. We just don't know who is buying these and how they are using them." As noted above, the descrambler is used to access "premium" channels and "pay per view" services not provided in the basic cable service, without incurring the normal charges. These additional charges can vary from $40 to $1,000 per month, depending on the tastes of the persons using the descrambler. The descrambler can last for many years. The $10,000 figure for damage resulting from each device sold, plaintiff argued, "reasonably ties into what the actual loss is to Time Warner Cable." Tr. at 129.

Under § 605(e)(3)(C)(ii), the court may increase the award of damages "by an amount of not more than $100,000 for *each violation* of [§ 605(a) ]." This, however, does not seem permissible, here, under the limitation of a civil contempt proceeding's relief to *compensatory* damages and *coercive* fines. Although the statute provides that attorneys' fees and costs *may* be awarded under § 553(c)(2)(C) at the court's discretion, and that they *must* be awarded under § 605(e)(3)(B)(iii) to a prevailing aggrieved party, under civil contempt these fees and costs are damages for which the plaintiff is entitled to compensation, without need for reference to the statute.

■ In the context of a civil contempt proceeding, the statutory damage values may be used to estimate the value of actual damage in order to compensate an aggrieved party who suffered actual damage. Here, however, *no* actual damage accrued to Time Warner from U.S. Cable's importation of the equipment because Time Warner acted so promptly. Thus, the statutory damage provisions are inapplicable to the importation of the descramblers. In civil contempt proceedings, the plaintiff is not entitled to compensation for damages that it did not actually experience.

Plaintiff, although not entitled to damages related to the 8,500 descramblers, is certainly entitled to its actual costs of seizure, including the payment of a $4,500 fee paid to Kim Vigil, who was, at the time, an employee of the defendant. The decision of defendant's own counsel not to ask Ms. Vigil about the terms of her agreement with Time Warner's investigator, whether tactical or inadvertent, does not thereby render Ms. Vigil's actions or testimony questionable. Ms. Vigil was also not asked how much Mr. Yeh was paying her to wind up his Florida operations, an income she gave up, presumably, when her Time Warner relationship became known to Mr. Yeh. Nor was she asked how much longer she anticipated receiving a salary from U.S. Cable at the time she informed Time Warner of the importation of the descramblers.

The accuracy of Ms. Vigil's testimony was, in substantial part, confirmed by the defendant's own testimony. The defendant's self-serving effort to blame Ms. Vigil for his decision to sell the equipment was not particularly credible, and, even if true, did not lessen the contumacy of the actions he acknowledges undertaking. The information provided to Time Warner by Kim Vigil enabled it to prevent the defendant from distributing 8,500 descramblers, many of which

would have been used on its systems. In this light, the amount paid to Kim Vigil does not seem excessive. In view of the defendant's knowingly contumacious conduct, it does not seem to the court inappropriate to assess the full informer's fee to the defendant.

### Damages Resulting to Time Warner from Yeh's Sale of Descramblers to Cable Box Wholesalers

 The analysis above that found no damage to Time Warner from the importation of the descramblers is equally applicable to the subsequent sale, or attempted sale, of 4,000 descramblers to Cable Box Wholesalers. Under this analysis it is unnecessary to determine whether the sale to Gary Curran of Cable Box Wholesalers was completed or not, because the facts that Curran never took delivery and that Time Warner obtained possession of the entire inventory precludes the award of damages to Time Warner that would compensate it for harm it never incurred. The court believes that the testimony of Ms. Vigil with regard to the transaction was, at least, more credible than Mr. Curran's self-serving affidavit. It was curious that Time Warner has presented neither testimony nor an affidavit from its investigator, Thomas Allen, who was present at the discussion between Ms. Vigil and Mr. Curran. Vigil at 48. On the other hand, the defendant did not call Mr. Allen to testify with regard to his observation of the transaction nor did the defendant cross-examine Ms. Vigil with regard to Mr. Curran's assertion that he was unable even to inspect the descramblers.

As noted above, although damages in connection with the 8,500 decoders are denied, Time Warner's costs and attorneys' fees related to this transaction are entirely compensable.

### Damages Resulting from Yeh's Sale of U.S. Cable's 800 Number to United Imports for Use by M.D. Electronics

 Although defendant argues that the sale of the 800 number was not prohibited by the Consent Judgment, that judgment provided that the "defendants, any of their servants, agents, employees, *successors, assigns, affiliates* and *persons* and/or entities acting on their behalf or *acting concert with them* are permanently enjoined and restrained from ... (c) ... selling, offering for sale, advertising for sale, distributing, ... any electronic equipment capable of descrambling ... any cable television telecommunication programming services or signals ... without further Order of this Court." Judgment at 5. (Emphasis added.) U.S. Cable and Yeh assigned the 800 number that they had used to sell illegal descramblers and executed a noncompete clause specifically referring to decoders (descramblers) to a company that Yeh had reason to know would use the 800 number to sell illegal descramblers. Pltf.Ex. 10. This clearly violated the provisions of the Consent Judgment and makes U.S. Cable and Yeh liable for the damages resulting to Time Warner from continued sales that occur through the 800 number. The defendant effectively assigned all the goodwill associated with his mail order sales of descrambling equipment when he sold his 800 number and entered into a non-compete agreement with United Imports (a corporation related to M.D. Electronics, the firm actually using the 800 number). The sale conveyed a substantial portion of the business of U.S. Cable in contravention of the Consent Judgment.

 Having found that the defendant's sale of the 800 number violated the Consent Judgment, it is necessary to assess the damage thereby inflicted on Time Warner. Time Warner presented evidence that U.S. Cable sold 744 descramblers into its territory in the three month period December 1994–February 1995. Def.Ex. 2A, 2B, & 2C. Although the defendant presented evidence after the hearing that the 800 number provider, Total-Tel, had blocked service to New Yorker callers prior to the sale of the 800 number, TotalTel also certified that this block was removed immediately after the number was transferred to United Imports/M.D. Electronics on August 10, 1995. Def.Ltr. Dated October 18, 1995 and Ex. 1.

U.S. Cable sold 744 decoders into plaintiff's franchise area in the three month period from December 1994—February 1995. After the hearing, the plaintiff submitted an advertisement appearing in the September

1995 *Popular Mechanics* that uses U.S. Cable's name and Florida address. This advertisement was undoubtedly known to the defendant, as it appeared less than a week after the 800 number was transferred to M.D. Electronics on August 10, 1995. Although goodwill is a wasting asset, that is one that depreciates in value, possibly rapidly, the value of the goodwill in the 800 number clearly exceeded the $40,000 U.S. Cable received for it under the distress conditions it was then experiencing. (And the damages to Time Warner greatly exceed that amount.) The September 1995 *Popular Mechanics* advertisement enhanced the goodwill transferred with the 800 number so that it is, therefore, reasonable to expect that total lifetime M.D. Electronics' sales through the U.S. Cable 800 number will, at a minimum, equal the 744 descramblers sold by U.S. Cable to the Time–Warner franchise area that has been documented by plaintiff in the period December 1994–February 1995.

The contumacy of the sale of the 800 number after the Consent Judgment was enhanced by Yeh's certain knowledge, first, that advertisements including that number had been published recently and, second, that another one would be forthcoming after the sale. The advertisements would, as Yeh knew from experience, generate business from the Time Warner franchise area. The fact that there was a block on New York calls immediately prior to the seizure of U.S. Cable's operations is irrelevant in view of the removal of the block when the 800 number was sold. Plaintiff's investigators detailed enthusiastic reports from the M.D. Electronics sales personnel about the volume of business generated by U.S. Cable's former 800 number. *See* B. Allen Aff. ¶ 18–19 dated October 10, 1995.

The 800 number was still being used by M.D. Electronics at the date of the contempt hearing on October 18, 1995—more than two months after its sale and a week after the defendant was aware that Time–Warner knew about the sale. B. Allen at 68–69. That M.D. Electronics had ceased identifying U.S. Cable when its operators answered the phone is immaterial to evaluation of the damage accrued and accruing to Time Warner from Yeh's transfer of the goodwill in U.S. Cable's 800 number. Plaintiff is entitled to $10,000 to $100,000 in damages per device sold that reached its region.

Section 605(e)(3)(C)(i)(II) provides statutory damages:

> . . . for each violation of paragraph (4) of this subsection involved in the action an aggrieved party may recover statutory damages in a sum not less than $10,000, or more than $100,000, as the court considers just.

Subsection (4) covers persons who import, sell, etc., knowing "that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by subsection (a) of this section, [found by the Second Circuit in *Sykes II* to cover cable decoder sales] . . ." Assigning to the sale of the 800 number for the use of M.D. Electronics only the minimum statutory damages under § 605 to the projected minimum of 744 descramblers sold into the Time Warner franchise area results in the assessment of $7,440,000 in damages against the defendant. These damages are intended to compensate the plaintiff for the harm it has and will suffer from the continuation of defendant's business by its assignee, M.D. Electronics.

### Assessment of Attorneys' Fees and Costs

The defendants object to fees related to first, plaintiff's interface with the United States Attorney for the District of Maryland, including liaison with Postal Inspectors, among others, and to their costs of storing defendant's documents under the Maryland subpoena; second, to the expenses related to plaintiff's efforts to obtain the proceeds from the Arizona bank check that Gary Curran of Cable Box Wholesalers brought to purchase the descramblers from Zentek, and, thirdly, to the informer fee plaintiff paid to Ms. Vigil.

*Costs Associated with Time Warner Compliance with the U.S. Attorney's Subpoena that are Related to the Contumacy Rather than the Pre-judgment Conduct of Defendant*

 The plaintiff received a subpoena, issued August 18, 1995, returnable Septem-

ber 11, 1995, from the United States Attorney for the District of Maryland, "requiring it to produce copies of 'All documents,' in its possession [relating to defendant] which relate to the 'sale, distribution, importation and/or manufacture of cable television decoders.' " Lefkowitz Reply Affirm. dated November 20, 1995 ¶ 3. Subpoena attached as Ex. A to Def. Affidavit dated November 9, 1995. The defendant has objected to plaintiff's application for fees incurred in connection with this subpoena. Defendant argues that, under the Consent Judgment, the plaintiff was allowed to retain his documents only until September 25, 1995 at the latest. Defendant argues that the documents are wholly unrelated to the contempt, because they were seized five days prior to the Consent Judgment.

The plaintiff, replying to the defendant's objections to these expenses, asserted that, under the broad subpoena it received, the contumacious conduct of the defendant fell under the terms of the subpoena. Plaintiff also states, that, but for defendant's contumacious conduct, it would have returned the documents to the defendant. Plaintiff also states that the "defendant's acts in contempt ... [caused it] to incur additional costs to comply with the subpoena that it would not have otherwise had to bear." Lefkowitz Reply Affirm. dated November 20, 1995 ¶ 3.

The Court accepts the plaintiff's explanation for the necessity of the retention of the documents and their relevance to the events constituting the contempt currently before the court. Mr. Yeh's contumacious conduct did not arise in a vacuum—he accepted delivery of decoders that had been ordered prior to the Consent Judgment and attempted to sell them to entities that had previously been his customers. He sold the 800 number on the basis of the calls it received prior to the Consent Judgment and with knowledge that at least one advertisement placed prior to the Consent Judgment would generate new business for it. As a result, the Court accepts the plaintiff's explanation that the expenses to store documents from the period prior to the Consent Judgment relate to the addition of the contumacious acts to the scope of the U.S. Attorney's investigation. In addition, the Court accepts the relation between the defendant's contumacious conduct and the conferences with the U.S. Attorney's Office and with the Postal Inspector included in plaintiff's documentation of costs.

*Costs Related to Cable Box Warehouse Bank Check*

 The defendant also objects to expenses charged for activities to obtain the funds from the Cable Box Wholesalers bank check seized from Gary Curran. Plaintiff argues that these actions were legitimately undertaken both to develop evidence for the civil contempt hearing and to pursue the "well established [remedy] that profits from a violation of an injunction are subject to disgorgement to the aggrieved party." Lefkowitz Reply Affirm., dated November 20, 1995, ¶ 4. Defendant's argument rests on the premise that no sale took place at the customs warehouse on August 23, 1995. There is clearly a factual dispute as to whether a *contract* of sale was formed between defendant and Cable Box Wholesalers within the customs warehouse. Based on the lack of credibility to be given to the self-serving Curran affidavit, produced after the contempt proceeding here and not subject to cross examination, the court finds it more likely than not that a contract was formed between defendant and Cable Box Wholesalers. These expenses were undertaken in a good faith effort to obtain the profits from the transaction that, had the effort been successful, would have reduced the defendant's liability for costs.

*Informant Fee Paid to Kim Vigil*

As noted above at 16, the Court finds the fee paid to Ms. Vigil was a cost of plaintiff's investigation of defendant's compliance with the Consent Judgment that must be paid by the defendant.

**Duration of the Revised Injunction**

 The parties have agreed to all terms of a revised permanent injunction except that of its duration. The issue is the defendant's wish to limit the injunction to a period of ten years rather than perpetuity. Ten year limits have been used by Judges Dearie and Korman in permanent injunctions in *Cablevision Systems Corp. v. Muneyyirci,* 90 CV

2997 (June 26, 1995) (Dearie, J.) and in *Cablevision Systems Corp. v. Cohen,* 84 CV 1155 (April 20, 1988) (Korman, J.). Both include the provision "... this injunction shall remain in full force and effect for a period not to exceed 10 years from the date of the entry of this injunction ..." Ten years is long enough to subject the defendant's conduct to this court's jurisdiction in an area so prone to technological change. If he violates the law regarding sale of unauthorized cable devices only after ten years of conformance, it does not seem unreasonable to require Time Warner to begin a new action under the law then applicable.

**Coercive Fine**

 Blatant though the defendant's violations have been, they do not appear to constitute a *continuing* contempt of the Consent Judgment. (M.D. Electronics' continued sale using the U.S. Cable 800 number is not within the defendant's power to terminate.) Although the court is skeptical that the defendant will so flourish in his new career as a commodities trader that he will not be tempted to resume his former lucrative trade in illegal descramblers, the evidence presented to the court does not support application of a coercive fine at this time. His sale of the 800 number the day *after* signing the Consent Judgment and his proceeding to import and sell 8,500 decoders within a few weeks of it does not suggest a high regard for his legal obligations. Nonetheless, there was no evidence at the October 1995 hearing, or since, that Yeh is continuing in his contumacy. The revised permanent injunction will permit Time Warner to bring any further contumacious behavior to the attention of the court for additional action. In that event, if repeated contumacy is demonstrated, the court may endeavor to fashion an appropriate coercive fine. In addition, to the extent that such future behavior constitutes criminal conduct, criminal prosecution is not foreclosed.

**Conclusion**

William Yeh, U.S. Cable T.V., Inc. and Zentek Corp. are found to have been in civil contempt of the Consent Judgment so ordered by this court on July 26, 1995. Plaintiffs are awarded $7,440,000 in damages in compensation for the harm they have and will suffer as the result of the sale of the U.S. Cable T.V. 800 number for use by another seller of cable descrambling devices. Plaintiffs are also awarded $55,471.64 in attorneys' fees and costs in connection with their investigation and prosecution of this contempt proceeding. Plaintiffs are ordered to accept a ten-year limitation on the revised permanent injunction otherwise acceptable to both parties.

SO ORDERED.