COMMUNITY TELEVISION SYSTEMS, INC., d/b/a TCI Cablevision of South Central Connecticut, et al. Plaintiffs,

v.

Angelina (a/k/a Julie) CARUSO, Michael Caruso, Philip Demilo, Sally Demilo, Charles Mingrone, Michelle White, Thomas White, et al., Defendants.

**No. 397CV1447 (AWT).**

United States District Court, D. Connecticut.

March 20, 2000.

Burton B. Cohen, Laura K. Norden, Marilyn Beth Fagelson, Murtha Cullina LLP, New Haven, for Community Television Systems, Inc., United Cable Television SVCS Corp plaintiffs.

Jonathan J. Einhorn, New Haven, CT, James F. Cirillo, Jr., New Haven, CT, James C. Delaney, New Haven, for Michael Caruso, Julie Caruso, Charles Mingrone, Thomas White, Michelle White.

James F. Storer, Branford, CT, for Anthony Cerino, Jean Ann Cerino.

Jonathan J. Einhorn, New Haven, CT, Daniel Shepro, Shepro, Brown & Blake, Stratford, CT, Thomas W. Bucci, Jr., Bridgeport, CT, for Philip DeMilo, Sally DeMilo.

Nelson Rivera, Wallingford, CT, pro se.

James F. Cirillo, Jr., New Haven, CT, for Angelina Caruso.

## MEMORANDUM OPINION

THOMPSON, District Judge.

### I. *Background*

Plaintiff Community Television Systems, Inc., d/b/a TCI Cablevision of South Central Connecticut ("TCI"), brings this suit alleging the theft of cable services by defendants Angelina (a/k/a Julie) Caruso and Michael Caruso (collectively, the "Carusos"), Philip DeMilo and Sally DeMilo (collectively, the "DeMilos"), Charles Mingrone ("Mingrone"), and Michele White and Thomas White (collectively, the "Whites"). The above-named defendants are the only remaining defendants in the case. Likewise, the case has been resolved as to all claims by the other plaintiff, United Cable Television Services Corporation.

TCI alleges that the defendants purchased "descramblers," i.e., devices designed to intercept premium and pay-per-view cable programming without authorization, and used, or assisted others in using, those devices in violation of two sections of the Federal Communications Act, namely 47 U.S.C. §§ 553 and 605. TCI seeks an award of statutory damages, attorneys' fees and costs, as well as a permanent injunction, after a trial to the court.

### II. *Findings of Fact*

TCI is a cable operator within the meaning of 47 U.S.C. §§ 552(5) and 553(a) and provides community antenna television ("cable") service within the meaning of 47 U.S.C. § 522(6) to its customers, who are authorized to receive the particular service level or service tier and any other video programming which a customer orders and agrees to pay the applicable rates therefor. Its franchise area includes, *inter alia,* the towns of Branford, East Haven and North Haven, Connecticut.

TCI offers cable services to residents of its franchise area for which subscribers pay a monthly fee which varies depending upon the amount of cable television programming and services selected and purchased by the subscriber. Each subscriber who pays monthly fees to TCI is entitled to receive the level of services and programming purchased from TCI.

TCI's signals are (a) interstate or foreign radio communications or transmissions and (b) private communications not intended for public or other use without authorization.

TCI has offered and continues to offer certain premium programming services, such as Cinemax, Showtime, and Starz, and certain pay-per-view channels for movies and events.

TCI's signals for premium channels and for pay-per-view services are electronically coded or scrambled so that they must be decoded by electronic decoding equipment in order for the signals to be viewed clearly on a television receiver or monitor. To decode those signals, TCI provides sub-

scribers to such services with electronic decoding equipment referred to as addressable converters. These addressable converters are programmed to decode the signals and enable the subscriber to view only that level of service which the subscriber has purchased. Addressable converters can be programmed from a central location at TCI's offices while the converters are attached to the television receiver or monitor in the subscriber's residence.

"Pay-per-view" is a service made available to TCI's residential subscribers. The pay-per-view service requires the subscriber to have an addressable converter box connected to his television receiver. To order a pay-per-view movie or event, the subscriber telephones TCI and requests to view the specific pay-per-view event. TCI then programs the addressable converter box to descramble that pay-per-view event, thereby enabling the subscriber to receive a non-scrambled signal during the time of the broadcast.

The price of pay-per-view movies or events varies, but ranged during the period relevant to this case from at least $2.99 for certain movies to at least $54.99 for certain sports or other special events. TCI subscribers are billed monthly for pay-per-view events ordered during the previous month. During the period relevant to this case, TCI has always offered its subscribers at least one pay-per-view channel, and at times has offered up to eight such channels. Since November 1997, it has offered five pay-per-view channels.

During the period relevant to this case, TCI has always offered its subscribers the following three premium services: Cinemax, Showtime and Encore. For a period, it offered The Disney Channel, and since February 1994, it has offered Starz. During the period relevant to this case, a subscriber could have purchased such premium services for an aggregate monthly cost ranging from at least $23.65 to at least $32.40.

Unauthorized decoders or descramblers are devices that decode TCI's signals and defeat the scrambling or addressable security functions of TCI's cable system which are designed to ensure that only authorized customers of certain levels of services receive such services. The use of such unauthorized decoders or descramblers causes TCI to suffer lost revenues from lost sales of premium and pay-per-view programming. The State of Connecticut is also harmed by these lost sales because the State loses taxes in connection with the revenue lost to TCI. Although information is available as to what TCI charged for certain types of programming, it is not possible to compute TCI's lost revenues here, as each defendant, who is the only one who knows the extent of his or her use of TCI's cable services, has chosen not to provide that information. For the same reason, no estimate can be made as to lost tax revenues.

In addition, the use of such unauthorized decoders or descramblers damages the technical integrity of TCI's cable system. Devices which are not approved by the Federal Communications Commission have the potential for "leaking" signals. Use of such devices may increase the "cumulative leakage index" above acceptable levels causing interference to aeronautical and emergency services' frequencies. Finally, the use of such unauthorized decoders or descramblers harms TCI's good will with honest customers who ultimately share some of the financial burden imposed by individuals who pirate services.

From on or about February 1990 to July 1994, Robert R. Radil manufactured, assembled, sold, and distributed approximately 965 descramblers; the purpose of the descramblers was to enable the user to obtain unauthorized reception of communi-

cations services offered over cable systems. Typically Radil received $160 per descrambler unit sold. Before selling a descrambler, Radil tested it to make sure that it worked on the cable system. Radil maintained records relating to the sales of these descramblers on a computer at his residence. Radil's computer was seized by agents of the Federal Bureau of Investigation (the "FBI") pursuant to a search warrant in July 1994.

It was Radil's practice to take an order for a descrambler, and then build it. He would then contact the customer to let the customer know the descrambler was ready.

Radil did not normally give his telephone number to his customers, and he kept as part of his records the customer's name and telephone number so he could contact the customer once the descrambler was ready. Sometimes he had only the customer's first name, or a nickname. In some instances, Radil's records also included the customer's address, but frequently the address was not included.

Using the records from Radil's computer, and where necessary, by contacting the telephone company or the Department of Motor Vehicles, the FBI developed a list of names, addresses and telephone numbers of Radil's customers and other information Radil recorded (the "FBI list"). As part of that process, the named defendants were correctly identified as individuals who had ordered and/or obtained descramblers made by Radil.

Radil's records show that the Carusos, the DeMilos, Mingrone and the Whites all obtained descramblers made by Radil during 1992. Those records show the date the descrambler was ordered and the date it was delivered, as well as each device's model and serial number. None of the defendants has surrendered to TCI, or to any proper authority, the descrambler he or she obtained from Radil.

Radil did not advertise. The majority of his business came about through referrals from previous customers. The Whites ordered their descrambler from Radil on March 25, 1992 and it was delivered on May 25, 1992. Michelle White is the daughter of the Carusos, and the Carusos ordered their descrambler on May 25, 1992. Mingrone is a friend of both the Carusos and the Whites, and his descrambler was ordered on July 31, 1992.

During the period relevant to this case, the Carusos, Philip DeMilo, Mingrone and Thomas White had accounts with TCI in their names; Sally DeMilo lived in the same household as Philip DeMilo, and Michelle White lived in the same household as Thomas White. At all times relevant to this case, each defendant has lived in TCI's franchise area. The Carusos have lived in East Haven, although, as described below, not in the same household at all times; the DeMilos have lived in North Haven; Mingrone has lived in Branford and East Haven; and the Whites have lived in Branford. At no time, however, were any of their households authorized to receive premium or pay-per-view services, with the exception of Home Box Office.

TCI tested two descramblers purchased from Radil, and those devices fully descrambled premium and pay-per-view services provided by TCI. The useful life of a descrambler like those manufactured and distributed by Radil is calculated to be seven years and has been known to exceed fifteen years.

Each defendant was deposed and was also asked by counsel for TCI to respond to interrogatories. In response, each defendant invoked his or her Fifth Amendment privilege against self-incrimination on numerous occasions (e.g., during the depositions, the number of such occasions ranged from 50 to 149). In the case of

each defendant the pertinent inquiries included, but were not limited to, whether that defendant had ordered or received a descrambler from Radil, and whether the descrambler identified on the FBI list was at that defendant's home. No defendant testified at trial.

The Carusos divorced and have not lived together since 1995. However, as noted above, each of the Carusos invoked his or her Fifth Amendment privilege against self-incrimination when asked about the present location of the descrambler. Thus, the court concludes that they both possessed the descrambler during that portion of the period in question when they lived together, and moreover, that, although it is most likely that only one of them is currently using the descrambler, the other one is assisting him or her in doing so.

As to Mingrone, Radil's records include Mingrone's name, together with that of his ex-wife, Angela. They were living together during 1992 at the address in Radil's records. Mingrone testified at his deposition that he did not order the descrambler from Radil and did not know Radil, and had never had any contact with him. The FBI list indicates that Radil's records had the names Joe and Mary Mathis linked to those of Angela and Chuck Mingrone. Mingrone testified at his deposition that Joe and Mary Mathis are Angela's parents, but he invoked his Fifth Amendment privilege against self-incrimination when asked whether he had ever received a descrambler from Radil, whether anyone living at his address at the time in question ever ordered a descrambler in his name, whether he had ever used a descrambler, whether he had ever sold or given away a descrambler, whether he was in possession of the descrambler, and whether his ex-wife was in possession of the descrambler.

Also, the court notes that although there is no indication the DeMilos knew any of these other defendants prior to the commencement of this case, each of the DeMilos invoked his or her Fifth Amendment privilege against self-incrimination when asked at his or her deposition whether he or she knew anyone who has at any time had a descrambler, and also with respect to related questions.

## II. *Discussion*

### A. *Liability*

TCI claims that the defendants have violated two sections of the Federal Communications Act, as amended, namely 47 U.S.C. §§ 553 and 603. Section 553 provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system ...." 47 U.S.C. § 553(a)(1).

Section 605 provides that "no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a). The court notes that the pertinent provision of Section 605(a) in this case is the third sentence, which is quoted above. *See International Cablevision, Inc. v. Sykes ("Sykes I")*, 997 F.2d 998, 1007 (2d Cir.1993); *International Cablevision, Inc. v. Sykes ("Sykes II")*, 75 F.3d 123, 131 n. 4 (2d Cir.1996). Section 605 does *not* apply where the interception at issue does not include any radio-originated communications. *See Sykes II*, 75 F.3d at 131 n. 5.

The two statutes provide for different measures of statutory damages, as was outlined by the court in *Sykes I*:

The principal substantive difference between the two enforcement schemes, for purposes of the present case, lie in (a) the minimum levels of statutory damages that must be awarded, and (b) the respective provisions for attorneys' fees .... Whereas for a violation of § 553(a)(1), the minimum damages awardable to an aggrieved person if the violator of that section was not aware and had no reason to believe that his acts constituted a violation is set at $100, the minimum damages awardable to an aggrieved person if the violator of § 605 was not aware and had no reason to believe that his acts constituted a violation of § 605 is set at $250, *see* 47 U.S.C. § 605(e)(3)(C)(iii). More importantly, whereas under § 553 the minimum statutory damages to be awarded against an aware violator is $250, under § 605 the minimum award against an aware violator is $1,000 for a violation of § 605(a) and $10,000 for a violation of § 605(e)(4), *see id.* § 605(e)(3)(C)(i)(II). Further, the minimum statutory award of $250 under § 553 is for "all violations involved in the action," *id.* § 553(c)(3)(A)(ii), whereas the minima of $1,000 and $10,000 for violations of § 605(a) and § 605(e)(4), respectively, are to be awarded for "each violation" of the pertinent subsection, *id.* § 605(e)(3)(C)(i)(II).

*Sykes I,* 997 F.2d at 1007.

█ Here TCI has proven that each of the named defendants received and/or assisted someone else in receiving without authorization, and in using for his or own benefit, cable service offered over TCI's cable system. The Carusos, the DeMilos, Mingrone and the Whites each obtained a descrambler made and sold by Radil. Based on the record here, the most reasonable inference is that each such transaction was engaged in with Radil so the descrambler could be used for its intended purpose, namely to receive cable service offered over TCI's cable system; there is no evidence of non-use or of any other use. Thus, the court concludes that each of the named defendants used and benefitted financially from a descrambler sold by Radil, commencing in 1992.

The useful life of a descrambler like those manufactured by Radil is calculated to be seven years and has been known to exceed fifteen years. The financial investment made in each of the descramblers was not insubstantial, and each defendant continues to receive cable service from TCI. Moreover, there is no evidence that any of the descramblers obtained by the defendants has been relinquished to appropriate authorities or disposed of. Based on the record here, the most reasonable inference is that each of the descramblers obtained by the named defendants from Radil continues to be used by at least one of the persons who obtained it if the descrambler is still functioning, or if the descrambler is not still functioning, was used until the end of its useful life. Thus, the court concludes that each of the defendants either continues to maintain possession of and uses a descrambler obtained from Radil, or, in the case of the Carusos and Mingrone, has assisted, and continues to assist, a former spouse who is doing so, or if the descrambler is no longer functioning, would be doing so but for that fact.

It is not necessary to rely on the force of the negative inference, which can properly be drawn in this case as to each defendant, in order to conclude that each defendant has violated these two statutes. However, the court notes that a negative inference, to be drawn from a defendant's invocation of the Fifth Amendment privilege against self incrimination, is properly admissible in civil actions when defendants "refuse to testify in response to probative evidence offered against them." *LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997)

(quoting *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)). Here, the inference from the defendants' refusal to respond to various interrogatories and numerous questions at their depositions regarding their obtaining and using descramblers made by Radil only adds weight to the court's findings in favor of TCI. In addition, the court finds the negative inference that should be drawn here relevant to its assessment of each defendant's conduct for purposes of determining the amount of statutory damages that is appropriate in this case.

The court notes that counsel for the defendants have made arguments to the effect that the information contained in Radil's records is or was not sufficient to identify the defendants and that there is no evidence of use by any defendant of a descrambler. The court has rejected those arguments because they fail to recognize the fact that the FBI used in its investigation parts of Radil's records that were not admitted at trial because they could not be printed and also used very reliable procedures to identify individuals for whom there was not a detailed set of identifying information in Radil's records; the results of its investigation are reflected in the FBI list, which was admitted into evidence and clearly identifies each defendant. Also, the defendants appear to fail to recognize the weight that is properly given circumstantial evidence. *See Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960) ("[D]irect evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."). *See also Concerned Area Residents for the Environment v. Southview Farm, et al.*, 34 F.3d 114, 120 (2d Cir.1994) ("[I]t is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts.") (quoting

*O'Brien v. Nat'l Gypsum Co.*, 944 F.2d 69, 72 (2d Cir.1991)).

Finally, as TCI's cable service involves radio and satellite transmissions, the court finds that its cable service is protected not only by § 553, but also by § 605.

### B. *Damages and Other Relief*

■ Where a defendant violates both §§ 553 and 605, the court "must assess damages under the more severe provisions of § 605." *Time Warner Cable of New York City v. Olmo*, 977 F.Supp. 585, 589 (E.D.N.Y.1997) Having concluded that damages in this case should be assessed under § 605, the court further concludes that each defendant was aware of that fact or had reason to believe that his or her acts constituted a violation of § 605. Thus, the damages provision in Subsection (e)(3)(C)(i)(II) is applicable, versus that in Subsection (e)(3)(C)(iii). Clause (C)(i)(II) provides, in pertinent part, as follows:

> The party aggrieved may recover an award of statutory damages for each violation ... of this section involved in the action in a sum of not less than $1,000 or more than $10,000, *as the court considers just.*

47 U.S.C. § 605(e)(3)(C)(i)(II) (emphasis added).

■ Here, the court considers the maximum in statutory damages, to be assessed against each defendant individually, to be just. Each defendant here appears to have employed a strategy of simply making it as difficult as possible for TCI to vindicate its rights. There was no merit to the arguments raised on behalf of the defendants at trial as to purported flaws in TCI's proof. In substance, each defendant merely rested on his or her Fifth Amendment right not to incriminate him or herself and the fact that the plaintiff has the burden of proof. No defendant gave any indication of having any concern about

what would be "just" in this case. Moreover, as noted above, the defendants' actions have negative implications for TCI not only in terms of lost revenues, but also in terms of the good will of its honest customers and the technical integrity of TCI's cable system. This is in addition to the loss in tax revenues for the State of Connecticut. While others could be equally deserving of having assessed against them the maximum in statutory damages, it is difficult to imagine a case where a defendant would be more deserving of being required to pay the maximum in statutory damages than is each of these defendants.

Pursuant to 605(e)(3)(B), the plaintiff is also entitled to reasonable attorneys' fees and other costs, as well as a permanent injunction against each defendant; an order directing the recovery of full costs is mandatory. Such additional relief is being granted. The injunction will provide that each defendant, and his or her servants, agents, employees, successors and assigns and those persons in active concert or participation with any of them, will be permanently enjoined and restrained from engaging in, aiding, abetting or otherwise promoting or supporting interception or reception of the cable television programming, service or signal of TCI, including, without limitation, doing any of the following:

(i) connecting, attaching, splicing into, tampering with or in any way using TCI's cable wires for purposes of obtaining any of TCI's programming services without TCI's authorization;

(ii) manufacturing, purchasing, obtaining, installing, owning or possessing an, equipment capable of unscrambling, intercepting, receiving, transmitting, retransmitting, decoding or in any way making available all or part of TCI's programming and services without TCI's authorization;

(iii) attaching or connecting any such equipment to any of TCI's property without TCI's authorization; and

(iv) further tampering with or making any connection to or any disconnection from or manipulating, in any manner, for any purpose, any of TCI's cable systems without TCI's authorization.

## IV. *Conclusion*

For the reasons set forth above, each of Angelina (a/k/a Julie), Caruso, Michael Caruso, Philip DeMilo, Sally DeMilo, Charles Mingrone, Michelle White and Thomas White is liable to plaintiff TCI for statutory damages in the amount of $10,000, pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II). Accordingly, the Clerk is directed to enter judgment in favor of TCI against those defendants for statutory damages in the amount of $10,000 each. A separate order setting forth the terms of the injunction against each defendant is being issued today. The plaintiff shall submit to the court within 30 days an application for attorneys' fees and costs incurred in connection with this action.

It is so ordered.