## CABLEVISION OF CONNECTICUT, L.P.

v.

## Robert NOFERI

No. 3:03CV2036 (JBA).

United States District Court, D. Connecticut.

April 25, 2005.

Elizabeth Corwin Oram, Day, Berry & Howard, Stamford, CT, Melinda M. Dus, Michael D. Cassell, Lefkowitz, Louis & Sullivan, Jericho, NY, for Cablevision of Connecticut, L.P.

Robert Noferi, Westport, CT, pro se.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT [DOC. # 34]

ARTERTON, District Judge.

Defendant, Robert Noferi ("Noferi"), moves pursuant to Fed.R.Civ.P. 56(b) for summary judgment on Plaintiff Cablevision of Connecticut, L.P.'s one count complaint, alleging violations of 47 U.S.C. §§ 553(a)(1) and 605(a). For the reasons set forth below, Noferi's motion for summary judgment is denied.

### I. Background

Cablevision, a Connecticut limited partnership, maintains a cable television system covering several towns in Connecticut, including Westport. Kempton Aff. [Doc. # 36, Ex. 1] at ¶ 2. Cablevision provides its subscribers with various levels of cable television programming. A subscriber may choose between either a "basic" or a "family" package of television programming.[1] *Id.* at ¶ 5. If a subscriber chooses, a subscriber may also purchase additional premium and pay-per-view programming at a price over and above the price charged for the basic and family packages. *Id.* at ¶ 7.

Cablevision's cable programming services are received from over-the-air transmissions from orbiting satellites and local radio towers, *id.* at ¶ 9, which are then transmitted to Cablevision subscribers via a network of cable wiring and equipment. To prevent subscribers from receiving programming services that they have not paid for, Cablevision encrypts or "scrambles" the signals for specific types of programming. *Id.* Cablevision rents a "converter-decoder" to its subscribers who elect to receive premium programming, to allow the subscriber to receive and view the cable programming services on his or her television.[2] *Id.* at ¶ 10. The converter-

---

1. Cablevision's "Basic" package consists of mostly broadcast programming, while its "Family" package consists of the same basic programming plus additional broadcast programming such as ESPN and A & E. Kempton Aff. [Doc. # 36, Ex. 1] at ¶ 5.

2. During the time period pertinent to this case, Cablevision leased to its subscribers, in

decoder converts the signals transmitted over the cable system into channels that may be viewed on the subscriber's television set, and descrambles programming services to allow the programming to be viewed by the subscriber. The converter-decoders that Cablevision provides to its customers have a feature known as "addressability," which enables Cablevision to control which programming services are descrambled. *Id.* at ¶¶ 13–14.

The electronic circuitry within converter-decoders is capable of being modified to enable users of altered converter-decoders to view all scrambled programming services, including premium and pay-per-view programming, without authorization from Cablevision, *i.e.* without paying. *Id.* at ¶ 17. These "pirate" converter-decoders, which are not addressable, may be used to gain unauthorized access to cable operators' programming services.

Defendant Noferi maintains a residence in Westport, Connecticut, and became a Cablevision customer on October 31, 1983. *Id.* at ¶ 25. During the time period at issue, Noferi maintained a subscription to Cablevision's "Optimum" level of service with "HBO" at a cost of $55.00 per month. *Id.* Additionally, Noferi rented a CFT2200 converter-decoder, with remote control, at a cost of $3.50 per month. *Id.*

In late 1999 or early 2000, Noferi contacted Wholesale Electronics to order a CFT2200 converter-decoder.[3] Noferi Dep. [Doc. # 36, Ex. 3] at 24–26. Noferi stated that his intention was to use the additional converter-decoder for the picture-in-picture feature on his television set. Noferi

testified he did not install the converter-decoder at the time he received it from Wholesale, but instead left it in his basement for several months. In the summer of 2000 Noferi discovered that the converter-decoder was broken and subsequently discarded it at the Westport dump. *Id.* at 31, 33–35.

Noferi contacted Wholesale to address the issue of the broken converter-decoder and subsequently placed an order for a second converter-decoder. Noferi Dep. [Doc. # 36, Ex. 3] at 36–37. Upon receipt of the second converter-decoder, Noferi plugged the device into an electrical outlet to determine if the device worked. *Id.* at 41. Noferi observed that the converter-decoder lit up, and he then placed the device back in its shipping box and again left it in the basement for several months. *Id.* at 42–43. The device was not removed from the basement until it, too, was discarded. *Id.* at 43.

## II. Standard

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party will be entitled to judgment as a matter of law if the non-moving party fails to make a sufficient showing on an essential element of his or her case upon which he or she bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To

---

the southwestern region, CFT2200 addressable converter-decoders. Kempton Aff. at ¶ 11.

**3.** Wholesale Electronics was in the business of selling "pirate" converter-decoders that allowed individuals using the converter-decoders to receive and view unauthorized

scrambled premium and pay-per-view programming. Kempton Aff. at ¶ 19. Furthermore, the "pirate" converter-decoders were not addressable, which prevented Cablevision from detecting the use of the "pirate" converter-decoders on its cable system.

defeat a motion for summary judgment, the non-moving party must set forth facts that show there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of fact exists if there is sufficient evidence on which a reasonable jury could return a verdict for the non-moving party. *Id.* at 248, 106 S.Ct. 2505.

When deciding a motion for the summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Yet, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## III. Discussion

Cablevision has alleged that Noferi has violated 47 U.S.C. §§ 553(a)(1) and 605(a) by using "pirate" converter-decoders to view unauthorized premium and pay-per-view events without paying the monthly or per event fees for the programming.[4] Compl. [Doc. # 1] at ¶ 19. Noferi, while admitting possession of two non-Cablevision converter-decoders, argues that possession alone is not a violation of 47 U.S.C. §§ 553(a)(1) and 605(a). Rather, Noferi contends that "a violation occurs only when a person intercepts or receives or assists in intercepting, not when a person purchases or possesses." Mem. of Law in Supp. of Summ. J. [Doc. # 34] at 3.

Section 553(a)(1) provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communication services offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." Section 522 of Title 47 defines specific terms used within section 553(a)(1). It is undisputed that Noferi is a "person" as defined by section 522(15) and that Cablevision is a "cable operator" that provides "cable service" through a "cable system," within the meaning of §§ 522(5), (6) and (7). Therefore, if Noferi intercepted or received or assisted in intercepting or receiving any unauthorized communications over Cablevision's cable system, he violated section 553(a)(1).

Section 605(a) provides that "[n]o person not entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit ...." There is a split in the circuits on the issue of whether cable television programming falls within the definition of "communication by radio."[5] *Compare Int'l Cablevision, Inc. v.*

---

**4.** It is well settled that a defendant may be liable under both section 553(a)(1) and section 605(a). However, recovery under sections 553 and 605 is not cumulative. *See CSC Holdings, Inc. v. Ruccolo,* 2001 WL 1658237 at \*1 (S.D.N.Y.2001). If there is a violation of both sections, a plaintiff may elect to take recovery under only one section. *See generally Int'l Cablevision, Inc. v. Sykes,* 75 F.3d 123, 129 (2d Cir.1996). The plaintiff will usually choose recovery under section 605 because it provides for greater monetary damages. *CSC Holdings, Inc.,* 2001 WL 1658237 at \*1.

**5.** "Radio communication" or a "communication by radio" is "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. § 153(33).

*Sykes,* 75 F.3d 123 (2d Cir.1996) with *TKR Cable Co. v. Cable City Corp.,* 267 F.3d 196 (3d Cir.2001)(holding that " § 605 encompasses the interception of satellite transmissions *'to the extent reception occurs prior to or not in connection with, distribution of service over a cable system,'* and no more.")(emphasis added); and *U.S. v. Norris,* 88 F.3d 462, 469 (7th Cir.1996) (holding that "cable television programming transmitted over a cable network is not a 'radio communication' as defined in § 153(b), and thus its unlawful interception must be prosecuted under § 553(a) and not § 605.").

■ In *Sykes,* the Second Circuit has held that "the continued transmission of radio signals via cable after their receipt at the headend of a cable television system can be regarded as the 'receipt, forwarding, and delivery of [radio] communications ... incidental to [the transmission]' of the pictures and sounds transmitted by those communications within the meaning of § 153(b)." *Sykes,* 75 F.3d at 131. The plaintiff, International Cablevision, received "satellite delivered program signals" at a "headend" facility and then delivered the signals to its customers via a coaxial ground cable system. *Id.* at 126. On this basis, the Second Circuit concluded that International Cablevision's delivery of cable service fell within the definition of "communication by radio" for the purposes of section 605(a). Accordingly, in the Second Circuit, section 605(a) applies to individuals who intercepted or received unauthorized cable service from a cable operator that receives signals from a satellite and then distributes the signals to its subscribers via a ground cable.

Cablevision's cable programming services are received from "over-the-air transmission from orbiting satellites and local radio towers," Kempton Aff. [Doc. # 36, Ex. 1] at ¶ 9, which are then trans-

mitted to Cablevision subscribers via a network of cable wiring and equipment. Thus, Cablevision's system of delivering cable service is the same as in *Sykes,* which is the controlling law to be applied, and the unauthorized interception of Cablevision's cable services, after the signals are received from the satellite, fall within the scope of section 605(a).

■ The main issue to be considered is whether there is evidence from which it can reasonably be inferred that Noferi used the converter-decoders he purchased from Wholesale Electric. Noferi argues that Cablevision has "failed to present any credible, factual evidence that the Defendant has used any electronic devices to receive unauthorized programming." Mem. of Law in Supp. of Summ. J. [Doc. # 34] at 4. Cablevision, however, argues that it can prove Noferi's use through circumstantial evidence. Mem. of Law in Opp. to Summ. J. [Doc. # 36] at 9.

Circumstantial evidence is not only sufficient evidence but it also may be, in some instances, "more certain, satisfying, and persuasive than direct evidence." *Community Television Systems, Inc. v. Caruso,* 134 F.Supp.2d 455, 461 (D.Conn.2000) (quoting *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960)). In *Caruso,* for example, the district court found after a bench trial that the evidence obtained from the records of an individual who sold illicit descramblers allowed a reasonable inference that the recipients of the devices used the devices for their intended purpose—to receive unauthorized cable service offered on the plaintiff's system. *Id.* at 460. Similarly, the district court in *DIRECTV Inc. v. McCool,* 339 F.Supp.2d 1025, 1033 (M.D.Tenn.2004), found that a factual dispute existed for trial where defendant denied that he purchased and used an unlooper device, and plaintiff's evidence of

unlawful interception of DIRECTV's satellite signal, "albeit circumstantial," showed "that an order was placed for the unlooper by someone using Defendant's credit card and e-mail address, and that the unlooper was shipped to Defendant's residential address." *Id.* at 1034; *see also DirectTV, Inc. v. Griepsma*, No. 03–CV–6243–CJS–JWF, 2005 WL 608250 at *7 (W.D.N.Y. March 11, 2005)(holding that although there was no direct evidence of use of an unlooper by the defendant, use could be inferred from the purchase and delivery of the unlooper to the defendant).

A genuine issue of material fact clearly exists in this case. Cablevision offers two invoices from Wholesale Electronics evidencing Noferi's two separate purchases of illicit CFT2200 converter-decoders. *See* [Doc. # 36, Ex. C]. Cablevision relies on this circumstantial evidence as supporting an inference of Noferi's use of the converter-decoders. Mem. of Law in Opp. to Summ. J. at 9. While Noferi does not rebut Cablevision's contention that there is no legitimate function or purpose for a "Wholesale Electric type" converter-decoder, he offers as corroboration of his claim of non-use evidence that his subscription level to Cablevision services actually increased during the time that he possessed the converter-decoders.[6] Def.'s Resp. to Pl.'s First Req. [Doc. # 36, Ex. 4] at 4, ¶¶ 4 & 7–9; Noferi Dep. at 34–35.

If the jurors do not credit Noferi's version of what he did with the converter-decoders he purchased and conclude that Noferi did in fact use the converter-decoders to obtain unauthorized access to Cablevision's premium and pay-per-view programming, they will find him to have violated both sections 605(a) and 553(a)(1). If, however, they credit Noferi that although he purchased the two con-verter-decoders, he never used them and thus he did not view unauthorized Cablevision programming, the jury's verdict will be in his favor.

For the purposes of summary judgment, Cablevision has set forth sufficient evidence in the form of invoices and defendant's admissions of purchase and delivery to support a verdict in its favor and thus has demonstrated that there is a genuine issue for trial on the issue of whether Noferi actually intercepted Cablevision's cable programming in violation of sections 553(a)(1) and 605(a).

## IV. Conclusion

Drawing the inferences from the evidence proffered in the light most favorable to Cablevision, a reasonable jury could find that Noferi used the two CFT2200 converter decoders to receive or intercept unauthorized cable programming from Cablevision's cable system. Accordingly, summary judgment is inappropriate and Noferi's motion for summary judgment is denied.

IT IS SO ORDERED.

---

6. Noferi offers one receipt and two "billing copies" showing an "upgrade" in his pro-

gramming subscription for the time period in question. Exhibit B & C [Doc. # 40].